[No. 27208-3-II.  Division Two.  April 12, 2002.]

PAULA BOND, *Appellant*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

568

*Howard L. Graham*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Lucretia Fishburn Greer, Assistant*, for respondent.

QUINN-BRINTNALL, A.C.J. — The Department of Social and Health Services (DSHS) determined that residents of Paula Bond's adult family home were in imminent danger and summarily suspended and then revoked Bond's license to operate an adult family home in Tacoma, Washington. Bond challenged the DSHS actions, but both the administrative process and then the superior court affirmed. Because we hold that Bond's actions placed the residents entrusted to her care in imminent danger, we affirm the revocation of her license.

## FACTS

Paula Bond was first licensed to operate an adult family home in Tacoma, Washington, in 1986. Five severely developmentally delayed adults lived in the home with her. Bond was the sole care provider for the residents, though she sometimes relied on a respite care provider as a backup.

The residents had lived in Bond's home for many years. Three of the young men are autistic. Two attended a special education program in the Tacoma School District. One other young man has cerebral palsy and pica, a disease where a person may eat anything that can be reached and needs fairly constant supervision. The other resident is a deaf and blind young woman who communicates using rudimentary sign language.

During the morning of October 2, 1997, Bond received a telephone call from her son saying that he was having chest pains. She had previously lost a son who died of a heart attack and she was quite upset. She called her backup respite provider, who did not answer the phone. She then called Anita, the mother of her oldest grandchild, to fill in for her. Anita was very familiar with the residents, but she had never been the sole care provider. Bond also did not know that Anita intended to watch four children in addition to her own three. Anita brought her three children to the home and the four others were dropped off shortly after Bond left.

Wayne Vrona was the Department of Social and Health Services inspector who was in charge of inspecting Bond's home. DSHS regulations require periodic unannounced inspections. Vrona had found several violations in a prior visit, and he had arranged to return to the Bond home on that day. He and deputy fire marshal Charles Hansen went to Bond's house without notice on October 2 at 1:30 P.M. to inspect the premises.

When they arrived, they rang the bell but no one came to the door. They went around back, where they saw the seven

children playing. The children ranged in age from 4 to 10 years old. When asked who was in charge, the children led them to Anita.

Anita let them in. She was making lunch for the group and did not spend a lot of time with the inspectors. They verified that she could not access the care plans for the residents. She did not know how to get into the locked basement. She did not have a current tuberculosis (TB) test, criminal background check, or current CPR (cardiopulmonary resuscitation) or first aid certification. She also could not locate the medical records or list of physicians for the residents. Most importantly, she also had no way to contact Bond. Her plan was to call 911 if any medical problem arose.[1]

The inspector and the fire marshal spent about an hour in the house, mostly looking around by themselves. While they were reviewing their notes in the car outside, the school bus came by and the two other residents came home. Vrona returned to his office and discussed the situation with his supervisor. They agreed at minimum that some of the children needed to leave to reduce the total number of persons in the home.

When Vrona returned to Bond's house at 4:30 P.M., he found that some of the children had gone home. Anita had called her mother to pick up four of the children. Bond, however, had not returned nor contacted Anita. Vrona did not stay long.

Bond returned to the home at about 5:00 P.M. She was gone those six hours because she realized that her son had been stung by a bee and was possibly having an allergic reaction. She administered care from a bee sting kit and stayed with him to make sure that he did not have an acute reaction requiring additional medical care.

---

[1] Vrona testified that when he asked Anita about her emergency plan, "She said she would call 911 and I asked, 'Well, do you know the name of the doctor? Do you know any medical condition?' She said, 'No.' 'Do you know any medical conditions that the residents may have that you could tell 911?' And she said, 'No.'" Report of Proceedings (Feb. 27, 1998) at 69.

The next day, DSHS issued a summary suspension, stop placement, and license revocation order regarding the home. DSHS personnel removed all five residents and took them to Rainier State School where they were evaluated and housed.

Bond appealed the summary closure. She first sought an injunction in Thurston County Superior Court. The Honorable Wm. Thomas McPhee denied the injunction. She then sued DSHS before an Administrative Law Judge, who ruled for DSHS. Bond sought review of this decision by the Board of Appeals, and it affirmed the prior decision. The superior court likewise affirmed. She now appeals to this court.

We address four questions: (1) Did DSHS err by affirming the finding of imminent danger to the residents? (2) Does equitable estoppel preclude DSHS from charging Bond with violations of the fire code? (3) Was DSHS required to provide Bond an opportunity to correct the deficiencies in her home before suspending her license? (4) Did DSHS err by finding that Bond committed neglect and abandonment?

## ANALYSIS

STANDARD OF REVIEW

■ Chapter 70.128 RCW authorizes DSHS' licensing of adult family homes. DSHS has the authority to act to correct adult family home licensing violations, RCW 70-.128.160(4), and chapter 34.05 RCW (the Washington Administrative Procedure Act (WAPA)) allows for judicial review of the Department's actions. The party challenging an agency's action must demonstrate that the action was invalid. RCW 34.05.570(1)(a); *Aponte v. Dep't of Soc. & Health Servs.*, 92 Wn. App. 604, 615, 965 P.2d 626 (1998), *review denied*, 137 Wn.2d 1028 (1999).

■ In reviewing administrative action, the appellate court sits in the same position as the superior court and applies the standards of the WAPA directly to the record before the agency. *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). We review conclusions

of law de novo under an error of law standard. *Williams-Batchelder v. Quasim*, 103 Wn. App. 8, 13, 19 P.3d 421 (2000). Factual determinations are sufficient only if supported by evidence that is substantial when viewed in light of the whole record before the court. *Martini v. Employment Sec. Dep't*, 98 Wn. App. 791, 795, 990 P.2d 981 (2000). The WAPA also allows a reviewing court to reverse an administrative decision when the decision is arbitrary or capricious. RCW 34.05.570(3)(i).

SUMMARY SUSPENSION AND LICENSE REVOCATION

*"NO HARM" ARGUMENT*

■ ■ Bond's primary argument can be summarized as "no harm, no foul." More precisely, she argues that because no harm occurred, this proves the residents were not in imminent danger, and the finding of "imminent danger" was in error. Here, the threat of harm was so great that the actual lack of harm at the end of that day cannot balance against it. As DSHS acknowledged, "While the Department may sympathize with Ms. Bond's apparent real fear for her son's health, she still had an obligation to ensure her residents were cared for by a fully qualified caregiver in her absence." Br. of Resp't at 29. This is the crucial point.

When DSHS arrived, the one caregiver for the residents was distracted with the needs of seven children. She was unable to change the undergarments of the young resident with pica on his schedule to keep him free of skin breakdown caused by his condition. She was barely able to pay attention to the other two residents. But most importantly, for almost six hours, she was unable to reach Bond, the only person with access to critical information. Given the fragility of the clients' medical situations, the threat is always great that something could happen to them. And Anita had no access to their physicians or medical information, and she could only resort to calling 911.

Although there are no similar cases with developmentally delayed adults in this state, this court two years ago addressed the "no harm, no foul" argument with a develop-

mentally delayed child in foster care. *Morgan v. Dep't of Soc. & Health Servs.*, 99 Wn. App. 148, 992 P.2d 1023, *review denied*, 141 Wn.2d 1014 (2000). In *Morgan*, the child was 14 years old but functioned at an 8- or 9-year-old level. The foster mother allowed her partner to leave the child unsupervised at the skating rink without alerting the staff. The child had a seizure and lost consciousness, but recovered fully. The foster mother argued, "[T]here [was] no evidence that [the girl's] health, welfare or safety was harmed." *Morgan*, 99 Wn. App. at 154. This court disagreed. "[H]er welfare and safety were harmed because she was placed at risk by being left with persons who did not understand her physical needs." *Morgan*, 99 Wn. App. at 154. This court then affirmed the revocation of her license.

Similarly here, the five residents (the three that were there when Anita arrived, and the two that came home from school) were left with someone who did not understand their fragile medical needs. Any possible harm, with catastrophic results, could have occurred for which Anita would have been unsuited to assist. Thus, the "no harm" argument fails.

*IMMINENT DANGER*

Bond also argues that substantial evidence does not support DSHS finding of imminent danger to the residents. She asserts that DSHS committed an error of law when it failed to follow statutory requirements to allow Bond to correct the violations prior to closing her adult family home and transporting the residents to another placement. Bond cites several RCW sections as support for her argument that she did not receive the required opportunity to correct the violations.[2]

---

[2] Bond cites RCW 70.128.090(2) ("[T]he department shall . . . serve a copy of the inspection report upon the provider at the same time as a notice of violation."), RCW 70.128.070(3) ("If the department finds that the home is not in compliance with this chapter, it shall require the home to correct any violations . . . ."), and RCW 70.128.090(3) ("The provider shall develop corrective measures for any violations found by the department's inspection."). Bond also quotes WAC 388-76--705(2)(a), implementing these statutes, which states,

"For failure . . . to comply with *any* applicable requirements of chapters 70.128 and 70.129 RCW or of this chapter, the department may provide consultation

DSHS argues that RCW 70.128.100 authorizes immediate suspension of a license when "it finds conditions in the facility constitute an imminent danger to residents." Br. of Resp't at 26. It highlights the definition of imminent danger, to wit: "serious physical harm to or death of a resident has occurred, or there is a serious threat to resident life, health, or safety." RCW 70.128.010(7). DSHS also argues that it is not required to wait for actual harm to the residents because the threat of harm, having extremely vulnerable adults left with an untrained caregiver, was great enough.

THE ADULT FAMILY HOME STATUTE

RCW 70.128.100 gives DSHS the ultimate power in cases of "imminent danger," which RCW 70.128.010(7) defines as "serious threat to resident life, health, or safety." WAC 388-76-705(2)(a) also authorizes DSHS to supersede the requirement of corrective action in a crisis. The DSHS Board of Appeals concluded imminent danger existed. "The substitute caregiver did not have access to the residents' medical records, physician contacts or emergency or evacuation plans. However understandable or excusable these circumstances may be in hindsight, they posed a serious risk and imminent danger to the residents at the time." Admin. Clerk's Papers at 8. We agree.

There is substantial evidence in the record that the risk of imminent danger was quite great. There was no one in the home familiar with the care plans, medical needs, or the physicians for the residents, and no emergency evacuation plan. The substitute caregiver did not know how to reach Bond, the only person who could provide medical and safety information for the residents. The caregiver also did not have the requisite background certifications.

---

and *shall* allow the provider a reasonable opportunity to correct before imposing remedies under subsection (3)(a) *unless* the violations pose a serious risk to residents, are recurring or have been uncorrected."

Br. of Appellant at 14 (emphasis added by Appellant).

One of our government's most sacred duties is to protect those unable to care for themselves. When balancing the needs of vulnerable adults entrusted to state care and the interests of even well-meaning caregivers who fail to provide necessary and adequate supervision over their charges, DSHS must give priority to the safety of these vulnerable adults.

Hence, we hold there was no error in the Board's conclusion that the situation at the time of inspection presented imminent harm to the residents and that DSHS appropriately used its power to close the adult family home.

EQUITABLE ESTOPPEL

Bond argues that DSHS knew from previous inspections that she had a wood-burning stove with no fire screen in her adult family home. She also claims that she was told by other DSHS staff that it would be permissible to have a double-keyed lock to prevent the residents from "running." Thus, she argues, she relied on these omissions to her detriment and DSHS should be estopped from revoking her license.

Under *Kramarevcky v. Department of Social & Health Services*, 122 Wn.2d 738, 863 P.2d 535 (1993), equitable estoppel may apply to state agencies. A claim of equitable estoppel against a government agency requires clear, cogent, and convincing evidence of (1) an admission, statement, or act by the government inconsistent with its later claim; (2) a party acting in reliance on the admission, statement, or act; (3) injury to the relying party if the government were allowed to contradict or repudiate its prior admission, statement, or act; (4) the necessity of estoppel to prevent a manifest injustice; and (5) no impairment of governmental functions if estoppel is applied. *Kramarevcky*, 122 Wn.2d at 743-44. A party claiming estoppel must show reasonable reliance. *Williams-Batchelder*, 103 Wn. App. at 18-19 (citing *Robinson v. City of Seattle*, 119 Wn.2d 34, 82, 830 P.2d 318 (1992)).

None of the requirements for an equitable estoppel argument are satisfied here. As DSHS argues, as a licensee,

Bond had the duty to be familiar with and comply with new home safety regulations released in 1996. In addition, Bond cannot prove that the exercise of governmental functions will not be impaired by applying estoppel here because DSHS is mandated to enforce licensing requirements for adult family homes. As stated in its brief, "[I]t would be unconscionable for the Department to be estopped from enforcing fire safety regulations in an adult family home." Br. of Resp't at 35.

The role of government, particularly when vulnerable adults are involved, is to ensure compliance by providers with all safety regulations. The government must step in the shoes of the guardian of the client and protect him/her from any serious threat, particularly those that are known and visible. Government functioning will be irreparably impaired if DSHS is estopped by previous oversight and unwarranted indications of tolerance from requiring its caregivers to meet updated safety regulations. Thus, we hold that DSHS is not estopped from enforcing fire and safety regulations.

THE INDIVIDUAL VIOLATIONS

Bond argues that five specific violations from the inspection were in error.[3] Our review of the record demonstrates that substantial evidence supports each violation. However, because we find the issue of imminent harm dispositive, we need not separately address each violation.

OPPORTUNITY TO CORRECT

■ Bond's other argument, that she was entitled to an opportunity to correct the violation, likewise fails. Bond herself cites the relevant WAC section, which states, "[T]he

---

[3] The Administrative Law Judge's Conclusion of Law No. 5 states,

The department has also established by the preponderance of the evidence that Appellant violated WAC 388-76-655(2)(a) and (c), WAC 388-76-680(2)(a) and (5) and WAC 388-76-685(1)(a)(i). Based on the evidence presented [Anita] did not possess a valid CPR card, did not have proof of recent testing for TB and had not completed a criminal history disclosure and background inquiry on October 2, 1997. Also, Appellant admits [Anita] never looked at the residents' records and did not know where to find them if she needed to review them.

Admin. Clerk's Papers at 94-95.

department . . . shall allow the provider a reasonable opportunity to correct . . . unless the violations pose a serious risk to residents . . . ." WAC 388-76-705(2)(a). Where, as here, the finding of imminent harm to the residents is established, DSHS is no longer required to allow the provider to correct the violation.

ABANDONMENT AND NEGLECT

The administrative law judge found that Bond violated former WAC 388-76-600(8) (1996) (residents shall be free from abuse, neglect, abandonment, or financial exploitation). The trial court reversed this finding because DSHS never specifically cited Bond for neglect or abandonment and DSHS conceded this point at oral argument.

█ █ We specifically affirm this reversal by the trial court. As DSHS acknowledged at oral argument before this court, abandonment and neglect are "terms of art." Abandonment requires leaving the vulnerable adult without means to obtain food, clothing, shelter, or health care. Neglect requires a pattern of conduct resulting in deprivation of care. WAC 388-76-540. The inspection did not support such findings, and DSHS did not charge Bond with either violation. DSHS conceded this argument to this court. Thus, we expect that Bond will be free of these allegations in any further dealings with DSHS.

We hold that Bond is not liable for neglect or abandonment but, because we hold that the residents entrusted to Bond's care were placed in imminent danger as a result of her actions, we affirm the revocation of her license.

MORGAN and HOUGHTON, JJ., concur.