273 P.3d 1017 (2012)
167 Wn. App. 446
Resa RAVEN, Respondent,
v.
DEPARTMENT OF SOCIAL & HEALTH SERVICES, Appellant.
No. 40809-1-II.
Court of Appeals of Washington, Division 2.
March 27, 2012.
*1018 Catherine Roubal Hoover, Attorney General of Washington, Olympia, for Appellant.
Jeff B. Crollard, Crollard Law Office, PLLC, Seattle, for Respondent.
Carol S. Vaughn, Thompson & Howle Downtown Office, Karen Marie Thompson, Attorney at Law, Seattle, Amicus Curiae on behalf of Washington Association of Profes.
Susan L. Kas, Disability Rights Washington, Seattle, Amicus Curiae on behalf of Disability Rights Washington.
ARMSTRONG, J.
¶ 1 The Department of Social and Health Services (DSHS) found that Resa Raven,[1] a court-appointed limited guardian, neglected her ward, Ida, by failing to provide the medical services Ida needed to maintain her health and prevent harm and pain to her. Raven appealed and the administrative law judge found no neglect. The DSHS Board of *1019 Appeals (Board)[2] reversed the administrative law judge, concluding that Raven neglected Ida by inattention and by failing to ensure that Ida's medical needs were met under the Abuse of Vulnerable Adults Act, chapter 74.34 RCW. The superior court reversed and awarded Raven attorney fees. DSHS now appeals.
¶ 2 We affirm the Board, thereby reversing the superior court. Although Raven's duty did not include guaranteeing effective care and treatment, it did include making every reasonable effort to provide the care Ida needed. And the findings support the Board's conclusion that Raven failed to meet her duty. We also reject Raven's argument that DSHS had to prove neglect by clear, cogent, and convincing evidence, rather than by a preponderance of the evidence. Finally, because DSHS's action was substantially justified, we reverse the trial court's award of attorney fees to Raven.

FACTS
¶ 3 Ida[3] was born on April 15, 1921, and died on April 24, 2007. In 1996, Ida fell and fractured her fibula, leaving her bedridden. Her leg muscles atrophied and she was no longer able to ambulate or sit up.
¶ 4 Ida became physically fragile, requiring assistance with most activities of daily living. She suffered from periodic urinary tract infections, ongoing rheumatoid arthritis, congestive heart failure, and allergies. She had muscle contractures that locked her legs in a splayed position. As of 2001, she was incontinent of bladder and bowel. She also experienced deteriorating pressure ulcers[4] associated with poor nutrition, lack of turning, and incontinence. These conditions caused Ida severe and chronic pain. In addition to her physical ailments, Ida had symptoms of dementia and hallucinations.
¶ 5 Catholic Community Services (Catholic Services) provided in-home care to Ida. DSHS's Area Agency on Aging (Aging Agency) provided case management, and Ida's husband and daughter provided additional care. Ida was often hostile, uncooperative, and physically abusive to her care providers. Her aggressive behavior was exacerbated when her husband failed to consistently administer her pain medication.
¶ 6 Ida resisted medical treatment between 1996 and 2001, although the reasons were not clear. A consultant noted on December 8, 2001, that she had a history of hallucinations and was disoriented. He also commented that home care was difficult because of her "personality" and because she was "very unclean when she came to the hospital" and was covered in stool and urine. Administrative Record (AR), Ex. 95 at 2113. Still, after an investigation in which it found some paranoia, Adult Protective Services (Protective Services) did not substantiate allegations of self-neglect.
¶ 7 In 2001, Ida refused surgery for her glaucoma and cataracts. In 2003, she refused to see a doctor when her dark stool suggested internal bleeding, stating that she did not care and that she wanted to die. Later that year, her daughter called the police so a doctor could inspect Ida's infected foot. Ida's primary care physician discharged her as a patient when she refused to come to his office.
¶ 8 In January 2004, Protective Services found self-neglect in a second investigation. DSHS petitioned for guardianship based on its concerns that Ida was refusing medical care and neglecting herself, and because her husband and daughter were unable to make competent decisions for her. Ida told Protective Services that she was refusing treatment and care because "she believed that her *1020 husband and caregiver had run away to California and left imposters behind." AR, Ex. 71 at 2055.
¶ 9 The superior court appointed a guardian ad litem (GAL), Jan Carrington, who arranged a mental health professional to evaluate Ida. The mental health professional documented that Ida was delusional and believed that her husband of 18 years was not her husband, that the emergency room doctor was not a doctor, and that the hospital was not St. Peter's. Carrington concluded that Ida needed a professional guardian with a mental health background who could reasonably assess Ida's needs and make competent health care decisions.
¶ 10 Based on the GAL's recommendation, the superior court appointed Raven as Ida's limited guardian on March 12, 2004. Raven is a licensed mental health counselor and a professional guardian. Ida was Raven's first ward as a guardian. The trial court gave Raven authority to (1) consent to or refuse medical treatment and (2) decide who would provide care and assistance. The court also granted Raven "[t]he power and duties of the guardian ... as required by RCW 11.92." AR, Ex. 25 at 1510.
¶ 11 After her appointment, Raven reviewed Ida's records, including the GAL's report, the Providence St. Peter Hospital records, and the court order appointing her. She discussed Ida's psychological problems with the GAL and met with the Aging Agency and Catholic Services personnel involved in Ida's care, along with Ida's daughter and husband. Raven concluded that Ida was variable in her responses to medical treatment but had consistently resisted nursing home placement. Raven visited Ida with some frequency during this investigative phase of their relationship but her home visits subsequently decreased, especially when Ida was under hospice care. Raven testified that she maintained a log of some, but not all, of her actions taken on Ida's behalf.
¶ 12 In November 2004, the Aging Agency comprehensively assessed Ida's condition and treatment plan. At the time, Ida had 10 pressure ulcers and the Aging Agency recommended bi-hourly repositioning to prevent further skin deterioration. The caregivers remained reluctant to turn her more than once or twice a day, however, because of Ida's intense pain. The assessment noted the continuing problems of rheumatoid arthritis, congestive heart failure, allergies, and angina.
¶ 13 In August 2005, a registered nurse from the Aging Agency examined Ida and concluded that she should be taken to the emergency room because of open sores on her leg, a possible urinary tract infection, and contractures of the leg. Raven stayed with Ida in the emergency room and she participated in planning Ida's discharge. Ida was discharged under hospice care because her life expectancy was considered to be less than six months. Raven selected Assured Home and Hospice as the hospice provider. Through hospice, Ida obtained a new primary care physician.
¶ 14 On October 19, 2005, an Aging Agency nurse assessed Ida's health and found only two pressure ulcers. On October 25, 2005, a hospice nurse spent "significant time" explaining to Ida's primary caregiver from Catholic Services the need to frequently turn Ida and control her pain. In her report, the nurse noted that the Catholic Services caregiver resisted these instructions because she believed that repositioning once a day was sufficient for skin care. The nurse concluded that Ida needed additional staff to reposition and medicate her if she was to remain at home.
¶ 15 On November 17, Raven conferred with the Aging Agency case manager, hospice nurse, and social worker to discuss concerns about Catholic Services' cooperation and Ida's husband's resistance to giving Ida pain medicine. Raven decided that they should wait until after the holidays to discuss changes to the situation to avoid additional stress.
¶ 16 Ida's skin condition was deteriorating in December 2005. In January 2006, the hospice nurses documented several painful stage II pressure ulcers. Raven and all the health care providers attended a care conference on January 10, 2006. Raven's notes acknowledge that Ida's pressure ulcers were worsening. The team agreed to seek additional *1021 support so that Ida could receive more hours of care and it could train the Catholic Services caregivers on techniques for turning Ida.
¶ 17 In February 2006, Ida's Aging Agency case manager asked Raven to fill the additional hours with independent care providers. Raven responded that she did not want to because she wanted providers who the agency supervised. The case manager then pointed out that the current plan was not working because they did not have enough workers. Raven replied that "we'd have to do the best we could with what we have." Administrative Record (AR), Verbatim Report of Proceedings (VRP) at 58. Raven explained that she was still determining whether Catholic Services could meet Ida's health care needs, but she acknowledged the possibility that Ida might need independent providers at some point.
¶ 18 Hospice discharged Ida as a client on May 16, 2006, citing difficulties with Ida's husband. Ida had become more agitated because he had not been medicating her as needed. Ida's hospice doctor quit the same day despite Raven's request that he keep Ida as a patient.
¶ 19 On May 30, 2006, Raven petitioned Thurston County Superior Court for direction on how to proceed with Ida's care. At the hearing, the superior court initially stated it believed that Ida needed institutional care and that the statute and appointment order authorized Raven to place Ida in an institution. Raven explained her concern that the statute prohibited her from placing Ida in a residential treatment facility against her will. The superior court then suggested that Raven hire, perhaps with financial assistance, an experienced attorney. Raven never followed the court's suggestion to contact an attorney.
¶ 20 On June 16, 2006, Raven met with the case managers and supervisors from the Aging Agency and Catholic Services. Raven was asked to find a new physician. She asked Catholic Services to implement staffing changes, and Catholic Services agreed to provide nurses to train the caregivers who could then legally give Ida her prescribed medicines.
¶ 21 Raven found an advanced registered nurse practitioner who was able to write Ida prescriptions. But one month later, the nurse took a new job and could not keep Ida as a client. When Ida's medications ran out in August, Raven transported her to the emergency room. Raven was given a list of doctors who accepted Medicaid patients, but she could not find one who was taking new patients.
¶ 22 On August 31, 2006, Raven made an appointment for Ida at the Sea Mar Clinic. Raven filled out new patient paperwork and Dr. Allison Spencer accepted Ida as a patient. Raven wrote to Dr. Spencer prior to the appointment:
At this point I am desperately in search for services that will allow [Ida] to receive hospice care, (or I suppose, some other form of in-home nursing services) so that she can continue to reside in her Lacey apartment. I think it unlikely that she will be with us much longer, and I am eager to make her as comfortable as possible in the time that she has remaining.
Br. of Appellant, App. A at 127.
¶ 23 Following the appointment, Dr. Spencer recommended a new hospice provider, Providence Home Care/Hospice. When Providence hospice took over Ida's care in November 2006, Ida had no areas of skin breakdown. But shortly thereafter, she developed new pressure ulcers. An Aging Agency representative informed Raven that Providence hospice was considering terminating its services because the medical social worker and clinical manager believed that in-home care was inadequate and that Ida should be admitted to a nursing home. Although Raven agreed that a nursing home would be best, she believed she could not admit Ida without a mental health professional's finding that Ida was eligible for involuntary detention. Raven arranged for an assessment, but the mental health professional found that Ida was not detainable because her symptoms were primarily medical.
¶ 24 A nurse delegation still had not been provided in November 2006. Raven contacted Catholic Services about the delay and *1022 learned that the paperwork had been lost but that the process was back on track.
¶ 25 By late November 2006, Ida's skin condition had significantly worsened; her new hospice nurse noted pressure ulcers ranging from stages IIV. The nurse thought that Ida should be receiving 24-hour care and that Ida's mattress was contributing to the breakdown on her skin because it was not remaining inflated. Providence hospice replaced the mattress with a continuous-flow air mattress. By December 2006, DSHS approved 280 hours of in-home care a month, but Catholic Services could provide only 189 of those hours and the remaining in home care hours were not filled.
¶ 26 In mid-December 2006, a severe winter storm caused power outages at both Ida's apartment and Raven's home. When the hospice worker and nurse arrived at Ida's apartment, the mattress had deflated and Ida was lying on the floor soaked in urine. Some of her pressure ulcers had progressed to stage IV and had become infected. Providence hospice contacted Raven about Ida's condition but Raven was unable to leave her house due to fallen trees. Because of Ida's deteriorating condition, Raven consented to hospitalizing her on December 30, 2006.
¶ 27 On January 5, 2007, Catholic Services gave notice that it would no longer provide care to Ida because it believed her home care had become unsafe. The Aging Agency also discussed terminating its services. With Raven's consent, Ida was transferred to a rehabilitation center on January 8, 2007. Although Ida's skin integrity improved following an aggressive turning program, she died on April 24, 2007.

PROCEDURE
¶ 28 DSHS's Protective Services issued notices of neglect to Raven in April 2007, June 2007, and January 2008, alleging that she failed to obtain medical care for Ida on two specific occasions and generally failed to ensure that Ida received the care she needed.[5] After notifying Raven of its investigation, Protective Services informed Raven that it had determined she neglected a vulnerable adult under RCW 74.34.020.

A. Administrative Hearing

¶ 29 Raven requested an administrative hearing to contest DSHS's neglect finding. After a five-day hearing, the administrative law judge (ALJ) reversed DSHS. DSHS appealed and the Board reversed the ALJ and affirmed the finding of neglect.

B. The DSHS Board's Conclusions

¶ 30 The Board upheld the ALJ's dismissal of the two specific instances of neglect, but it found that Raven had generally committed neglect by failing to ensure that Ida received the care she needed. Specifically, the Board held that Raven had a duty to ensure that Ida's basic medical needs were met in her home in light of the decision not to place Ida in a residential treatment facility. The Board reasoned that Raven had a duty to become knowledgeable of Ida's medical needs so she could make informed decisions on her behalf to regularly meet with Ida to ensure that she was getting proper care, and to release her guardianship if she could not meet Ida's medical needs. The Board concluded that "[a]ttempts at remedying Ida's untenable situation were not enougheffective results or turning the responsibility over to others who could obtain the necessary results was required." Br. of Appellant, App. A at 167 (emphasis omitted). But the Board also concluded that Raven's duty was "to the extent possible, to select residential placement for Ida that enhanced her quality of life, [and] provid[ed] for Ida's physical comfort and safety." Br. of Appellant, App. A at 163 (emphasis added).
¶ 31 The Board further determined that, although Raven appropriately considered Ida's resistance to nursing home care, the decision was not "etch[ed] in stone." Br. of Appellant, App. A at 161. Accordingly, Raven should have continued to test the strength of Ida's opposition when it became obvious that in-home care could not cope with her *1023 "stage IV ... ulcers, [with] skin burns caused by urine saturation, and the pain associated with such afflictions." Br. of Appellant, App. A at 161. The Board specifically noted that Ida had agreed to a nursing home stay when she fractured her fibula in 1996, and she accepted nursing home care in January 2007 after her condition had been in the "crisis stage ... for some time." Br. of Appellant, App. A at 162.
¶ 32 The Board concluded that Raven had a duty to have meaningful in-person contacts with Ida to observe her circumstances. Raven's log of her visits evidenced only six in 2004, two in 2005 (both when Ida was hospitalized), and five in 2006. The Board reasoned that more frequent visits would have allowed Raven to re-evaluate her decision not to place Ida in a full-time residential facility for rehabilitative care and Raven may have better appreciated the "emergent need to remedy the shortfalls in the day-to-day care being provided for Ida."[6] Br. of Appellant, App. A at 166.
¶ 33 The Board concluded that Raven could not excuse herself from "procuring independent caregivers to provide necessary bi-hourly repositioning and timely personal bath care [because] ... she was not experienced in supervising such staff." Br. of Appellant, App. A at 167. The Board reasoned that if Raven lacked knowledge or experience, she had a duty to retain qualified persons who could supply the knowledge and experience.
¶ 34 The Board found that Raven's duty to remain knowledgeable about Ida's medical condition was "especially critical" when Raven learned that Ida had no primary care physician, that certain caregivers resisted positioning Ida bi-hourly and ensuring that she got her pain medicines, and that staffing shortages prevented adequate repositioning and bathing. Br. of Appellant, App. A at 164. The Board found it "perplexing" that although Raven spoke of an "impending crisis of care" in her May petition to the court and was aware that Ida was lying in urine and feces with open wounds, the "status quo" continued until the late December hospitalization. Br. of Appellant, App. A at 165.
¶ 35 Finally, the Board found that Raven's lack of attention and remedial action contributed to Ida's inadequate pain management, re-positioning, and personal care. The Board concluded that Raven was responsible for ensuring that these three critical medical care needs were met, and that her failure to do so constituted "a pattern of conduct or inaction that failed to provide the services to maintain Ida's physical health and failed to avoid and prevent physical harm to her." Br. of Appellant, App. A at 168.
¶ 36 On review, the superior court reversed the Board and awarded Raven $25,000 in attorney fees and costs.

ANALYSIS

I. STANDARD OF REVIEW
¶ 37 Under the Administrative Procedures Act, a reviewing court may reverse a government agency's adjudicative decision if, among other reasons, the agency erroneously interpreted or applied the law or substantial evidence does not support the order. RCW 34.05.570(3)(d)-(e); Timberlane Mobile Home Park v. Wash. State Human Rights Comm'n, 122 Wash.App. 896, 900, 95 P.3d 1288 (2004). We apply the Act's standards directly to the government agency's record without regard to the superior court's decision. Timberlane, 122 Wash.App. at 900, 95 P.3d 1288. A party challenging an agency's decision must demonstrate its invalidity. RCW 34.05.570(1)(a). We review an agency's legal conclusions de novo to determine whether the hearing judge correctly applied the law. Timberlane, 122 Wash.App. at 900, 95 P.3d 1288. Although we give substantial weight to an agency's interpretation of the law where it has special expertise in applying it, the agency's interpretation does not bind us. Bowers v. Pollution Control Hearings Bd., 103 Wash.App. 587, 596, 13 P.3d 1076 (2000).
¶ 38 We review an agency's factual findings for substantial supporting evidence. *1024 RCW 34.05.570(3)(e); Superior Asphalt and Concrete Co. v. Dep't of Labor and Indus., 112 Wash.App. 291, 296, 49 P.3d 135 (2002). We will find evidence substantial if it is sufficient to persuade a fair-minded person of the truth or correctness of the order. Brighton v. Dep't of Transp., 109 Wash.App. 855, 862, 38 P.3d 344 (2001) (citing City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wash.2d 38, 46, 959 P.2d 1091 (1998)). We do not weigh the witnesses' credibility. Brighton, 109 Wash.App. at 862, 38 P.3d 344 (citing U.S. West Commc'ns, Inc. v. Utils. & Transp. Comm'n, 134 Wash.2d 48, 62, 949 P.2d 1321 (1997)).

II. THE ABUSE OF VULNERABLE ADULTS ACT
¶ 39 The Abuse of Vulnerable Adults Act, chapter 74.34 RCW, requires DSHS to investigate allegations of abandonment, abuse, exploitation, and neglect of vulnerable adults. A vulnerable adult is a person over the age of 60 who lacks the functional, mental, or physical ability to care for herself. RCW 74.34.020(16)(a).
¶ 40 The Act defines "neglect" as:
(a) a pattern of conduct or inaction by a person or entity with a duty of care that fails to provide the goods and services that maintain physical or mental health of a vulnerable adult, or that fails to avoid or prevent physical or mental harm or pain to a vulnerable adult; or (b) an act or omission that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100.
RCW 74.34.020(12).

A. Duty of Care

¶ 41 Raven maintains that her duty of care did not require her to guarantee Ida's health. She contends that her duties as a guardian were constrained by (1) the substitute decision-making statute, RCW 7.70.065, which requires a guardian to consider whether the patient, if competent, would consent to the proposed health care; (2) RCW 11.92.190, which prohibits a guardian from detaining her ward in a residential treatment facility against her will; and (3) nurse delegation laws, which prohibit caregivers from administering medication without monitoring by a nurse. Raven challenges the Board's conclusion that she was ultimately responsible for either ensuring that Ida received all of the services she needed or relinquishing her role as guardian.
¶ 42 Finally, Raven reasons that there were "obstacles beyond [her] control that limited her ability as a guardian to solve" Ida's medical care problems. Br. of Resp't at 34. Specifically, she points to the "prohibition against placing Ida in residential care," the refusal of the mental health professional to involuntarily commit Ida, the loss of a doctor/nurse practitioner and the inability to get a nurse delegation of medications in place earlier, the delay when DSHS lost the nurse delegation paper work, Ida's refusal to be repositioned frequently, the inherent difficulty of filling a one-hour evening shift, a faulty mattress, and then a winter storm that "rapidly accelerated the downturn in Ida's skin condition." Br. of Resp't at 34.
¶ 43 DSHS argues that Raven had a duty to ensure that Ida received the care she needed and that Raven failed to fulfill this duty, largely through a pattern of inattention. More specifically, DSHS points to Raven's failure to (1) secure sufficient in-home care, (2) personally observe, monitor, and consult with Ida on a regular basis, (3) take her to a treatment facility to see if she would agree to stay, and (4) address the situation when no one was administering Ida's medication.
¶ 44 A "guardianship" is "`a trust relation of the most sacred character.'" In re Guardianship of Eisenberg, 43 Wash.App. 761, 766, 719 P.2d 187 (1986) (quoting 39 AM JUR. 2D GUARDIAN & WARD, § 1 (1968)). A guardian owes a fiduciary duty to her ward. Eisenberg, 43 Wash.App. at 766, 719 P.2d 187; Cummings v. Guardianship Servs. of Seattle, 128 Wash.App. 742, 755 n. 33, 110 P.3d 796 (2005).
¶ 45 A court-appointed guardian owes a duty of care to her ward. RCW 11.92.043(4). Specifically, a guardian has a duty "to care for and maintain the incapacitated person in *1025 the setting least restrictive to the incapacitated person's freedom and appropriate to the incapacitated person's personal care needs, [and to] assert the incapacitated person's rights and best interests." RCW 11.92.043(4). In addition, chapter 11.92 RCW requires a medical guardian to file a personal care plan that includes an assessment of the incapacitated person's medical needs, file an annual update on the incapacitated person's status, and report to the court any substantial change in the incapacitated person's condition. RCW 11.92.043(1)-(3).
¶ 46 In providing informed consent to care, a guardian has the duty to reasonably determine what health care the ward, if competent, would have consented to. RCW 7.70.065(1)(c); RCW 11.92.043(5). Involuntary detention in a residential treatment facility is generally prohibited in Washington State. RCW 11.92.190. But the guardianship and involuntary treatment statutes operate independently to achieve different purposes. In re Schuoler, 106 Wash.2d 500, 504, 723 P.2d 1103 (1986).
¶ 47 In addition to these statutory provisions, the Washington State Standards of Practice Regulation for Certified Professional Guardians discuss the substituted judgment standard of RCW 7.70.065, providing that a guardian shall make reasonable efforts to ascertain the incapacitated person's historic preference and shall give significant weight to those preferences while making decisions in their best interest. REG. 400 STANDARDS OF PRACTICE REGULATION § 402.1 (2012), WASHINGTON COURTS, available at http://www.courts.wa.gov/committee. Specific to making medical decisions, a guardian shall monitor care, treatment, and services to ensure that care is appropriate, and actively promote the health of a client by arranging for regular preventative care.
¶ 48 The GAL's report recommending Raven's appointment as medical guardian set out the "steps" she intended Raven to take if appointed: "[Raven] would visit Ida ... to assess her needs, monitor the care she receives, communicate with her family and caregivers to ensure her needs are being met, and ensure she receives appropriate medical attention." AR, Ex. 24 at 1506. Raven described her duty more generally as "to identify the incapacitated person's medical needs to the best of my ability and ... access available services to meet those needs." AR, VRP at 755.

B. Breach of DutyCausation

¶ 49 Raven first argues that to establish neglect, DSHS had to prove that her actions or inactions caused Ida harm. Raven claims that DSHS impermissibly speculates that had she done things differently, Ida would have accepted and received the necessary care.
¶ 50 DSHS counters that the neglect statute does not require it to prove causation. DSHS argues that it can prove neglect by showing that someone with a duty of care repeatedly failed to provide the necessary goods and services to meet the medical needs of a vulnerable adult. DSHS argues that the record demonstrates that Ida suffered pain and harm and lacked sufficient in-home care. Thus, according to DSHS, evidence that Raven repeatedly failed to secure needed medical care is sufficient to show neglect without showing harm.
¶ 51 In a common law negligence claim, a plaintiff must prove that the claimed harm would not have occurred but for the claimed negligence. Miles v. Child Protective Servs. Dep't, 102 Wash.App. 142, 159-60, 6 P.3d 112 (2000). The Act creates a separate cause of action from common law negligence that includes its own standard by which we measure the claimed misconduct or inaction. Warner v. Regent Assisted Living, 132 Wash.App. 126, 134, 130 P.3d 865 (2006); see also Conrad v. Alderwood Manor, 119 Wash.App. 275, 292, 78 P.3d 177 (2003) (common law negligence and neglect under the Act are two different claims). The Act requires DSHS to prove a pattern of conduct resulting in a deprivation of care. RCW 74.34.020(12); see, e.g., Bond v. Dep't of Soc. & Health Servs., 111 Wash.App. 566, 577, 45 P.3d 1087 (2002). But it plainly does not require DSHS to prove that such pattern of conduct caused Ida harm or that if Raven had offered an alternative care plan, Ida would have accepted it. Raven offers no *1026 authority to the contrary. And we will not consider an assignment of error not supported by argument or authority. RAP 10.3(a)(6).

C. Breach of DutyNeglect Based on a Pattern of Inaction

¶ 52 The events of November 2005 through February 2006 illustrate Raven's pattern of dealing with Ida's medical needs. On November 17, Raven met with Ida's case manager, the hospice nurse, and a social worker to discuss generally the problems with Ida's home care plan. Raven testified that their focus was on the "bereavement issue," which was the "family ... still adjusting to the idea that Ida was in the dying process." AR, VRP at 575. She asked that the team members "just be thinking about what we needed to do here and talk ... after the holidays." AR, VRP at 575-76. She explained her reason for the delay: the family was dysfunctional and in turmoil and because the holidays were stressful, it was not the time to make a change. During December, Ida's pressure ulcers were worsening with several stage II ulcers, which were causing her considerable pain. The team met again on January 10, 2006. Raven testified that the issues had changed to "medical ones" because the hospice caregivers were documenting Ida's deteriorating skin condition. AR, VRP at 577. Raven described the plan as "more emphasis placed on turning [Ida]," and attempting to get more hours for caregivers. AR, VRP at 578-79. She denied that they discussed looking for independent caregivers. And she had only the "vaguest recollection" that in February she discussed getting more independent caregivers with another team member, and she did not understand that she was to hire them. AR, VRP at 581. Rather, she was "still trying to sort out the issue of whether we could use the existing care agency or not." AR, VRP at 582.
¶ 53 Raven appropriately considered Ida's preference to remain at home. But Raven was obligated to balance this preference against Ida's clear medical needs. Ida had been bedridden since 1996. Her history of pressure ulcers dates back to at least 2001. She became incontinent of bladder and bowel in 2001. She had rheumatoid arthritis, congestive heart failure, allergies, and periodic urinary tract infections, which may have caused or contributed to her dementia and hallucinations. When Raven was appointed Ida's limited guardian in March 2004, she reviewed Ida's records and met with Ida's case manager and some of her caregivers. In November 2004, Ida had 10 pressure ulcers, and the evaluating nurse recommended bi-hourly repositioning but reported that the caregivers resisted this. In August 2005, another nurse found open sores and a urinary tract infection and recommended taking Ida to the emergency room. Ida was discharged under hospice care because she was not expected to live six months. She continued to have pressure ulcers. Although the ulcers sometimes cleared, they always returned and over the months became more serious.
¶ 54 And by late 2005 or early 2006, it was clear to all the caregivers that in-home care was not working for Ida. Catholic Services was able to supply only a morning shift of two hours and an afternoon shift of two hours. Although DSHS authorized more hours of coverage for Ida, none of the agencies involved in Ida's care could find staff to fill them; and Raven was not receptive to seeking independent caregivers. Nor did Raven approach Ida with the possibility of reconsidering a nursing home or other residential placement. And the record does not show that Raven consulted with others more experienced in transitioning a home-bound patient to a nursing/rehabilitative residential facility; she also apparently did not follow the superior court's suggestion to talk with an attorney after the May 2006 hearing. Yet, the medical providers were telling Raven that Ida needed to be in a residential facility. In failing to aggressively pursue transitioning Ida from home care to residential care, Raven was not balancing Ida's wishes against her medical needs; rather, she was allowing Ida's historical opposition to residential care to override her critical medical needs. This failure to balance Ida's needs against her stated desires is particularly egregious when Raven knew or should have known that Ida's rejection of medical *1027 care in 2004 was based on Ida's delusions that the caregivers were "imposters," that her husband had fled to California, that the emergency room doctor was not a doctor, and that St. Peter's hospital was not St. Peter's hospital. Giving weight to Ida's principled decisions about the kind of care she would want if competent does not include allowing her delusions to control the care she actually needed. This is not a situation where the guardian had to choose between a treatment with a high chance of success that would cause permanent disability or a treatment with lower odds of success without the disability. See In re Guardianship of Ingram, 102 Wash.2d 827, 829, 689 P.2d 1363 (1984). Rather, the decision here was whether to continue with the failing home care program or more aggressively pursue the alternative institutional care Ida needed.
¶ 55 By November 2005, Raven had been Ida's guardian for 20 months. During that time, Ida had been repeatedly treated for pressure ulcers. The treating nurses had recorded their complaints that the caregivers were not cooperating in turning Ida and ensuring that Ida's husband gave her the medicines she needed. Ida had also been hospitalized for open sores and a urinary tract infection and discharged to hospice care. And several treating nurses had recommended that Ida be placed in residential care. In short, Ida's needs were immediate and critical. Raven's response was to postpone decisions and to try to make the long-failing home care plan work, a pattern that did not change until January 2007 when Ida was admitted, apparently without objection, to a rehabilitation facility.
¶ 56 We reject Raven's attempt to place the blame for Ida's plight on "obstacles" beyond her control. We agree that Ida's case presented difficult problems. But as Raven succeeds in demonstrating insurmountable "obstacles" associated with the home care program, she also demonstrates that aggressively pursuing residential care for Ida was her only reasonable choice. Moreover, Raven's obstacle argument frustrates the very purpose of her appointment as Ida's guardian. When Raven reached the conclusion that obstacles were beyond her control, she should have stepped aside. We are satisfied that the Board did not err in finding this two-and-a-half year pattern of inaction to be neglect.[7]

III. SUBSTANTIAL EVIDENCE
¶ 57 Raven argues that DSHS's decision lacks substantial evidence to support its findings of fact 6, 59,[8] and 75, and conclusions of law 17 and 46, finding and concluding that Ida's poor nutrition and lack of repositioning every two hours may have caused her skin breakdown and that Raven was asked to hire independent providers to assist with this care.[9]
¶ 58 We review an agency's order for substantial supporting evidence. RCW 34.05.570(3)(e). We review an agency's conclusions of law under the error of law standard. RCW 34.05.570(3)(d). Dep't of Ecology v. Lundgren, 94 Wash.App. 236, 241, 971 P.2d 948 (1999). Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth or correctness of the matter. King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 553, 14 P.3d 133 (2000).
¶ 59 Finding of fact 6 provides that Ida needed repositioning every two hours to minimize skin breakdown. The record establishes *1028 that Ida's assessments and care plan documented her skin issues and that she needed to be repositioned because she was bed bound. The record provides substantial supporting evidence for this finding.
¶ 60 Finding of fact 59 provides that Raven was asked to hire independent providers. An agency case manager testified that she asked Raven to find independent providers because the care plan was not working due to the lack of caregivers for repositioning. Thus, the record provides substantial evidence for this finding.
¶ 61 Finding of fact 75 provides that poor nutrition and lack of repositioning caused Ida's skin breakdown in November 2006. Nurse Zaire testified that Ida's ulcers were caused by poor nutrition and lack of repositioning. The record provides substantial evidence for this finding.
¶ 62 Conclusions of law 17 and 46 recite that Raven failed to make in-person contacts with Ida and failed to pay attention to Ida's medical needs. The Board concluded that Raven had a duty to ensure Ida's medical care needs were met, including: bi-hourly repositioning, timely bathing, and administration of medication. These conclusions are a mixture of factual and legal conclusions. To the extent they can be read to mean that Raven had a duty to guarantee that Ida's needs were met, the statements are too broad. But the conclusions are not important or necessary to our decision because, as we have explained, we hold that Raven's duty generally was to provide, to the extent reasonably possible, all the care Ida needed. We view the specific acts, such as infrequent visits, which the Board characterized as duties, to be evidence of Raven's failure to meet her general duty.

IV. STANDARD OF PROOF
¶ 63 Raven argues that the administrative law judge denied her due process of law by requiring DSHS to prove neglect by a preponderance of the evidence, rather than by clear, cogent, and convincing evidence. She asserts that a finding of neglect will seriously threaten her future employment by barring her from working unsupervised with children or vulnerable adults. Raven concludes that a finding of neglect "will have a devastating impact" on her counseling license, tantamount to a revocation, and that due process thus requires the higher standard. Br. of Resp't at 46.
¶ 64 The evidentiary standard for a finding of neglect is preponderance of the evidence as codified in WAC 388-71-01255(1).[10] Agencies and courts have consistently applied this standard in administrative hearings when determining if a vulnerable adult has been neglected. See e.g., Kabbae v. Dep't of Soc. & Health Servs., 144 Wash.App. 432, 437-38, 192 P.3d 903 (2008). In determining whether due process requires an agency to meet a higher standard, we consider three factors: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation and the probable value of additional safeguards; and (3) the government's interest. Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). We review constitutional questions of law de novo. Amunrud v. Bd. of Appeals, 158 Wash.2d 208, 215, 143 P.3d 571 (2006).
¶ 65 Here, the purpose of the administrative hearing was to determine whether Raven had neglected Ida, not to revoke her mental health counselor license. Raven argues that a finding of neglect is tantamount to a license revocation because RCW 74.39A.050(8) would prevent Raven from working unsupervised with vulnerable adults.[11] Raven is partially correct; a finding *1029 of neglect would legally bar her from working with any organization that contracts with DSHS under RCW 74.39A.050(8). Based on the record, however, it is not clear whether this would entirely prohibit Raven from using her license or whether it would merely preclude her from working in one sector of the industry. In addition, Raven cites no authority that a finding of neglect amounts to a license revocation. Thus, we hold that the neglect finding is not equivalent to a revocation and uphold application of the preponderance standard to prove neglect under chapter 74.34 RCW.
¶ 66 We affirm the Board's final order and reverse the superior court. We also reverse the superior court's award of attorney fees to Raven.
I concur: WORSWICK, A.C.J.
QUINN-BRINTNALL, J. (concurring in the result).
¶ 67 In my opinion, the majority's acknowledgment that "Ida's[12] case presented difficult problems" severely understates the enormity of the task Resa Raven took on. Majority at 1027. I write separately because the record before us is replete with accounts of Ida's delusions, her hostile and abusive manner towards her care providers, and her husband's unwillingness to administer medications as directed. Nevertheless, Raven agreed to take on the duty to facilitate Ida's medical health care needs and advocate with care providers and I agree she has failed to perform that duty.
¶ 68 I recognize that Raven had no duty to provide care for Ida herself and that Washington law did not require her to visit Ida any specific number of times per year. Yet here, the record shows that despite Ida's deteriorating condition, Raven neglected to make home visits necessary to assess personally the consequences of the caregivers' unwillingness or unavailability to reposition Ida as required. Raven's absence prevented her from building rapport with Ida and her family to better discern Ida's emergent needs and possibly obtain Ida's consent to residential treatment facility care. The facts of Ida's growing urgent need for additional care demanded frequent meaningful home visits and Raven should have made such visits to satisfy her guardianship duties. Raven's inaction after May 2006, when Ida had no primary physician and received inadequate in-home care, was a blatant dereliction of her duties.
¶ 69 Accordingly, I concur in the result that substantial evidence supports the Department of Social & Health Services Board of Appeals' finding that Raven did not reasonably perform her guardianship duties especially after it became clear that she was unable to obtain the care and support Ida required. If, because of her own inexperience or for any other reason, Raven could no longer facilitate Ida's necessary medical care (either by hiring the funded additional independent care providers or placing Ida in a residential treatment facility), then implicit in her guardianship duties was her duty to release herself as guardian and ask the trial court that she be replaced with someone better qualified.
NOTES
[1] We refer to Resa Raven, formerly known as Eileen Lemke-Maconi, as Raven.
[2] The Board adopted the decision of its review judge.
[3] Under the confidentiality provisions of RCW 74.34.095, we refer to Ida by her first name only.
[4] A "pressure ulcer" is a localized injury to the skin and underlying tissue, also known as a "pressure sore" or "bed sore," usually over a bony prominence, caused when a person's body is pressed against a surface for long periods. Administrative Record (AR) at 1950. The National Pressure Ulcer Advisory Committee categorizes pressure ulcers into four stages. Stage I is an area of redness that does not quickly fade. Stage II is a superficial area of breakdown, like a blister. Stage III is an area of damage that extends below the skin to the subcutaneous tissue. Stage IV is a wound extending to the muscle and bone.
[5] The two specific instances were (1) in August 2006, when Raven decided not to take Ida to the emergency room when her leg appeared broken, and (2) in December 2006, when Raven did not make contact with Ida for several days after wide-spread power outages caused by the storm.
[6] Raven's expert testified that although Washington law did not require a certain number of visits, it would have been better if Raven had visited Ida more often.
[7] We do not discuss the Board's conclusions that Raven had specific "duties," including making frequent visits, procuring independent caregivers, and becoming knowledgeable about Ida's treatment. These are more appropriately considered as evidence of Raven's breach of her general duty to provide, to the extent possible, the care Ida needed.
[8] While Raven assigns error to finding of fact 59, in briefing, both parties specifically cite to the content of finding of fact 62. We may waive technical violations of RAP 10.3(g) where, as here, both party's briefs make the nature of the challenge clear and include the challenged findings in the text. Daughtry v. Jet Aeration Co., 91 Wash.2d 704, 709-10, 592 P.2d 631 (1979); RAP 1.2(a).
[9] Unchallenged findings of fact are verities on appeal from administrative board rulings. Dep't of Labor & Indus. v. Tyson Foods, Inc., 143 Wash.App. 576, 582, 178 P.3d 1070 (2008). Raven limits her challenges to a small number of findings of fact.
[10] "The [administrative law judge] shall decide if a preponderance of the evidence in the hearing record supports a determination that the alleged perpetrator committed ... neglect of a vulnerable adult." WAC 388-71-01255(1) (emphasis added).
[11] Division Three addressed a similar argument in Kraft v. Dep't of Social and Health Services, 145 Wash.App. 708, 716, 187 P.3d 798 (2008), a case involving abuse of a vulnerable adult. The court held the proper standard of proof under chapter 74.34 RCW was preponderance of the evidence. Kraft, 145 Wash.App. at 716, 187 P.3d 798. The State argues that Kraft's finding of neglect cannot be equivalent to a license revocation. But Kraft actually held that the proceeding was not equivalent to revocation because Kraft did not hold a license to work with vulnerable adults and did not establish that a finding of neglect would cause her to lose her teaching certification. Kraft, 145 Wash.App. at 716, 187 P.3d 798. Notably, Raven does rely on her license to work with vulnerable adults and she has provided support that a finding would impair her ability to employ her license.
[12] For purposes of confidentiality, I refer to Ida by her first name only.