# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE        JUL 18 2013

CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on July 18, 2013

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

RESA RAVEN,

                              Petitioner,

v.

DEPARTMENT OF SOCIAL and HEALTH
SERVICES,

                              Respondent.

NO. 87483-2

EN BANC

Filed        JUL 18 2013

STEPHENS, J.—The Department of Social and Health Services (DSHS)
made a finding of neglect against guardian Resa Raven based on events that took
place during Raven's guardianship of Ida, an elderly incapacitated person.[1] Raven
challenges this finding, which the Court of Appeals affirmed. *Raven v. Dep't of
Soc. & Health Servs.*, 167 Wn. App. 446, 273 P.3d 1017 (2012). We reverse the
Court of Appeals and hold that a guardian's good-faith determination that her ward
opposes nursing home placement cannot be the basis for a finding of neglect in

---

[1] Mindful of the confidentiality provisions of RCW 74.34.095, only Ida's first
name, and the first names of her family members, is used here. In addition, Raven was
formerly known as Eileen Lemke-Maconi, and some of the testimony and exhibits
contained in the record address her as such.

light of the legislature's clear mandate against placing incapacitated persons against their will. We further hold that substantial evidence does not support the conclusion that Raven's conduct otherwise met the statutory definition of neglect. Finally, although the evidence does not support a finding of neglect against Raven, DSHS's actions were substantially justified, and we therefore deny Raven's request for attorney fees under the equal access to justice act (EAJA), RCW 4.84.350(1).

## FACTS AND PROCEDURAL HISTORY

Ida became bedbound in 1996, at the age of 75, after a fall fractured a bone in her knee. Ida suffered from several serious and debilitating ailments, including muscle contractures that locked her legs in a splayed position, incontinence, rheumatoid arthritis, dementia, and hallucinations. She experienced severe and chronic pain. An adult protective services (APS) report in 2001 found that Ida, a retired nurse, had a "'long history and lifestyle pattern of independence and reliance on naturopathic and alternative medicine.'" Administrative Record (AR) at 104-05 (Review Decision and Final Order of DSHS, Finding of Fact 20) (quoting Ex. 67, at 1).[2] After her fall, this pattern continued. Ida was resistant to medical care and was combative, violent, hostile, and uncooperative with her caregivers, including her husband Richard, her daughter Cheryl, and caregivers

---

[2] In this opinion, the record compiled at the administrative hearing will be cited as Administrative Record (AR). The testimony taken at the administrative hearing will be cited as Administrative Report of Proceedings (ARP). Citations to the Clerk's Papers refer to the record created by the Piece County Superior Court in its review of the agency action.

from Catholic Community Services (CCS). Her history between 1996 and 2004 is rife with episodes of self-neglect, problems with her caregivers, and medical crises.

A significant area of medical concern for Ida after becoming bedbound was pressure sores. Pressure sores (also variously known as skin breakdowns, pressure wounds, pressure ulcers, or bedsores) occur when a bony protrusion under an individual's skin (for example, the tailbone) has prolonged contact with a surface. Frequent repositioning of a bedbound individual is required. Pressure sores are exacerbated by lack of timely personal hygiene such as infrequent cleansing after bowel movements or urination. Left untreated, bedsores can become severe and life-threatening.

In 2004, at the age of 83, Ida was adjudicated incapacitated. Raven, a licensed mental health counselor and a certified professional guardian, was appointed Ida's limited guardian of person in March 2004. Ida was Raven's first ward. As a Medicaid dependent, Ida had very little income, and Raven was allowed fees of up to $175 per month for her services as a guardian. *See* AR at 111 (Finding of Fact 38).[3] Raven spent time after her appointment as guardian familiarizing herself with Ida's history and medical situation. Based on her review of Ida's history and conversations with Ida's family, Raven determined that Ida, when competent, consistently refused to be placed in a nursing home or other long-

---

[3] Although the finding of fact was that Raven could collect up to $175 a month in fees, her testimony at her hearing was that DSHS authorized a monthly fee closer to $70. ARP at 540.

term care facility. Accordingly, Raven consented to a plan of care on Ida's behalf that kept Ida in her home.

When Raven assumed the guardianship, Ida's personal care continued to be provided by CCS, which contracted with DSHS through DSHS's agent, Thurston County Area Agency on Aging (AAA). AAA provided case management. When Raven was appointed, Ida had no primary care physician, and Raven began working to resolve this issue. It was difficult to find a physician for Ida given her combative history, her lack of ambulation, and her financial resources.[4] In August 2005, Raven convened a care conference to discuss several issues, foremost of which was the lack of a primary care physician. Shortly after the conference, Ida was taken to an emergency room due to bedsores, leg pain, and the need for a doctor. As part of the hospital's discharge plan, Ida was paired with a team from Assured Home Health and Hospice (Assured), which included a physician.

In November 2005, Assured convened a care conference to address the reemergence of Ida's pressure sores, which Assured felt were caused in part by CCS's caregivers not turning Ida enough. Ida was resistant to repositioning because it caused her pain, which in turn led to reluctance on the part of her caregivers to turn her. All of Ida's plans of care called for repositioning every two hours, but due to staffing shortages, this was not an attainable goal, particularly

---

[4] As a result of being bedbound, Ida's muscles had atrophied to the point where she could not sit up. In order to leave her bed to see a doctor, she had to be transported by gurney in an ambulance. *See* AR at 98 (Finding of Fact 5), 108 (Finding of Fact 34); ARP at 558. Raven testified that Medicaid would not pay for ambulance transport for a routine visit. *Id.*

because Ida needed two people to turn her. Assured also had concerns, shared by Raven, that Richard, Ida's husband, was not consistently administering Ida's pain medication, which exacerbated the difficulty staff had in repositioning Ida. Raven decided that any remedial steps should wait until after the holidays, reasoning that the holidays would be stressful enough for the family without additional disruptions to Ida's care.

At a follow-up conference in January 2006, it was agreed that CCS would embark on a more aggressive turning program with training from Assured staff on repositioning techniques. Following the meeting, a request for more personal care hours was made to DSHS with the idea that this would enable a more aggressive turning program. The request was granted in February or March 2006.

A period of relative calm in Ida's medical status followed the January 2006 conference. During this time, in early 2006, Ida's AAA case manager discussed with Raven the possibility of hiring independent care providers as a way of filling gaps in CCS's care staffing. AR at 122 (Finding of Fact 61). Independent providers contract directly with DSHS, and it is the responsibility of the patient/client or her guardian to hire and supervise the independent providers, as opposed to caregivers provided by an agency like CCS, which supervises its employees. DSHS authorized approximately one additional hour of paid care for two aides. The administrative law judge (ALJ) concluded it was speculative that independent providers could have been found for the care hours CCS could not staff, given the difficulties associated with Ida's case. The review judge adopted

this finding. AR at 122 (Finding of Fact 62). Additionally, Raven decided against this option because she did not feel equipped to supervise such providers. AR at 123 (Finding of Fact 62).

In May 2006, Ida's situation destabilized again when Assured quit as a result of the medication management in Ida's home. Without consistent administration of Ida's pain and anxiety medication by her husband, Assured felt Ida's behavior became too combative for staff to manage and that staff was at risk of harm. Assured's exit from Ida's care team also meant she lost her physician. Raven petitioned the Thurston County Superior Court for direction on what steps to take next, but the court's advice—to seek an out-of-home placement—ran afoul of Ida's wishes. Raven did not pursue the court's other suggestion: to retain an attorney to petition for an order granting Raven leave to fire CCS or to assist in compelling Ida's caregivers (including Richard) to cooperate with her plan of care. *See* AR at 1544-45 (Ex. 29, at 11-12). There was some acknowledgement in the colloquy that Raven already had the authority to replace CCS. *See* AR at 1546 (Ex. 29, at 13). The court also suggested Raven look into involuntary commitment; Raven did not pursue this option for several months.

A June 2006 care conference was convened with CCS to discuss whether the agency could continue to meet Ida's needs. The idea of getting nurse delegation certification for CCS workers was suggested, which would allow them, rather than Richard, to give Ida her medication. The necessary paperwork was filed with

DSHS for CCS workers to receive nurse delegation certification.[5]  During this period, Raven turned to a certified nurse practitioner friend to obtain a refill of Ida's pain medication and also continued to look for a primary care physician for Ida.

In mid-August 2006, Raven arranged to have Ida transported to the emergency room because Ida had no more pain medication and still had no doctor to prescribe a refill.  On August 31, Raven was able to get Ida an October appointment with a doctor at Sea-Mar Clinic.  As a result of the appointment, Ida was assigned a new hospice team from Providence Home Care/Hospice (Providence).

At the time Providence joined Ida's care team, Ida had no bedsores even though during this time she did not have all of her care hours filled.  *See* AR at 128.  But by November 15, 2006, Ida's condition had deteriorated and she had several very serious bedsores.  *Id.*  Between November 15 and December 14, Raven had several calls with Providence's medical social worker, Linda Monterastelli, about Ida's bedsores, though Raven did not go to see Ida.  Raven told Monterastelli that she would support Ida being taken to the hospital if that was Monterastelli's recommendation.  AR at 130.  During these conversations in late

---

[5] Unfortunately, the paperwork was lost by one of the agencies dealing with it and nurse delegation was delayed.  It was not quite in place when Ida went to the rehabilitation center where she died, so this record is silent on whether it would have made a difference in Ida's care.  The ALJ and review judge made no express findings about the impact of nurse delegation one way or another, and the review judge based no conclusions of law regarding his finding of neglect against Raven on the basis that she failed to diligently pursue nurse delegation.

November 2006, Monterastelli shared her opinion that Ida needed 24-hour nursing home care. AR at 129. Raven did not disagree but explained that she did not believe she could authorize such a placement against Ida's wishes. *Id.* Raven suggested to Monterastelli that they attempt to have Ida involuntarily committed through a designated mental health provider (DMHP). AR at 129 (Finding of Fact 77). Monterastelli made an immediate referral to a DMHP, but the DMHP concluded Ida did not fit the criteria for involuntary commitment. *Id.*

On December 14, 2006, a severe winter storm hit Thurston County. Both Raven and Ida's homes were without power—Raven's for several days until December 21 and Ida's intermittently between December 15 and 17. Raven was unable to call out on a telephone or leave her house for several days. During the power outages, Ida's condition took a turn for the worse when her special mattress deflated, leaving her susceptible to worsened pressure sores. Due to Ida's rapid deterioration following the power outages, at some point just after the storm Monterastelli contacted APS to see if it could arrange 24-hour care for Ida. A referral was made to APS investigator Glenda Specht. On or around December 29, Specht made contact with Ida and determined her condition warranted emergency care. With Raven's consent, on December 30 Ida was admitted to the hospital. CCS gave notice it was terminating its services, and Raven consented to have Ida transferred to a temporary rehabilitation treatment center on January 8, 2007. Although she stabilized at the treatment center, Ida died on April 24, 2007.

DSHS made a founded finding of neglect against Raven, alleging a pattern of conduct or inaction that constituted neglect and also alleging that Raven's conduct with regard to Ida during the December 2006 storm constituted neglect.[6] After a five-day hearing, an ALJ reversed the finding. A DSHS review judge reinstated the finding as to the pattern of neglect but concluded that Raven's actions during the winter storm, involving circumstances outside of Raven's control, did not constitute neglect. AR at 169. This determination has not been challenged by DSHS, and thus Raven's actions between December 14 and 21, 2006, are not at issue.[7] Pierce County Superior Court Judge Kitty-Ann van Doorninck reversed the finding of neglect based on a pattern of conduct. Division Two of the Court of Appeals reversed the superior court and reinstated the neglect finding. A petition for review from Raven followed, which we granted.

## ANALYSIS

This case requires the court to review DSHS's substantiated finding of neglect against Raven, as affirmed by an order of its review judge. DSHS is tasked with investigating allegations of neglect against vulnerable adults, which includes

---

[6] A founded finding is a determination made by agency staff. DSHS also alleged that Raven's failure to transport Ida to the hospital following an August 2006 conversation with an AAA consulting nurse was neglect. The review judge disagreed, and that original finding is not at issue. AR at 169.

[7] The parties discuss the winter storm at length in their briefing. Likewise, several findings of fact in DSHS's decision are devoted to it. To be clear, the time period encompassing the storm is noteworthy only in that Ida took a turn for the worse to such a degree that she ended up in the rehabilitation center where she died. In light of the unchallenged findings, these events are not germane to the question of whether Raven was neglectful.

persons ordered incapacitated by the courts and elderly persons who are unable to care for themselves. RCW 74.34.020(17). "Neglect" is

> (a) a pattern of conduct or inaction by a person or entity with a duty of care that fails to provide the goods and services that maintain physical or mental health of a vulnerable adult, or that fails to avoid or prevent physical or mental harm or pain to a vulnerable adult; or (b) an act or omission that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100.

RCW 74.34.020(12). Here, the DSHS review judge affirmed the finding of neglect on the grounds that Raven's conduct met the criteria under both prongs of subsection (a): a pattern of conduct or inaction that (1) failed to provide the goods and services that maintain physical or mental health of a vulnerable adult or that (2) failed to avoid or prevent physical or mental harm or pain to a vulnerable adult.

The Administrative Procedure Act (APA), chapter 34.05 RCW, guides an appellate court's review of an agency order. An agency order may be invalidated only if one of the circumstances contemplated in RCW 34.05.570(3) is present.[8]

---

[8] These criteria are
 (a) The order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied;
 (b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law;
 (c) The agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure;
 (d) The agency has erroneously interpreted or applied the law;
 (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;
 (f) The agency has not decided all issues requiring resolution by the agency;
 (g) A motion for disqualification under RCW 34.05.425 or 34.12.050 was made and was improperly denied or, if no motion was made,

The party asserting the invalidity carries the burden to show the invalidity. RCW 34.05.570(1)(a). The appellate court reviews de novo an agency's conclusions of law and its application of the law to the facts. *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). Findings of fact are reviewed under the substantial evidence test and will be upheld if supported by """"a sufficient quantity of evidence to persuade a fair-minded person of [the order's] truth or correctness."""" *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 588, 90 P.3d 659 (2004) (quoting *King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000) (quoting *Callecod v. Wash. State Patrol*, 84 Wn. App. 663, 673, 929 P.2d 510 (1997))). With these general standards of review in mind, we turn to the first issue presented by Raven.

A. A guardian's good-faith decision not to place an incapacitated person in a nursing home against the incapacitated person's wishes cannot be the basis for a finding of neglect

One of the difficulties of this case from the perspective of Ida's care team is that Ida often required more care than could be delivered in a home setting. But in matters of consent, though a ward may choose a course of action that would strike many as unreasonable, if the guardian can determine that the ward would choose such an action if competent, the guardian is bound to advocate for that position.

---

facts are shown to support the grant of such a motion that were not known and were not reasonably discoverable by the challenging party at the appropriate time for making such a motion;

(h) The order is inconsistent with a rule of the agency unless the agency explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency; or

(i) The order is arbitrary or capricious.

RCW 34.05.570(3).

After investigating the issue of Ida's residential placement preferences, Raven determined that when competent, Ida consistently refused to be placed in a nursing home or other long term care facility. AR at 108 (Finding of Fact 32). DSHS found that Raven's determination that Ida would not choose out-of-home care was made in good faith. *Id.*

Substitute decision-making on behalf of incompetent individuals poses particular difficulties. In *In re Guardianship of Ingram*, 102 Wn.2d 827, 829-31, 689 P.2d 1363 (1984), a guardian sought a court order forcing a ward to submit to a laryngectomy for cancer treatment when the ward's preference was for radiation. Although the laryngectomy was far more likely than radiation to be successful at putting the ward's cancer into remission, it would also most likely result in the ward losing her vocal cords. This court acknowledged that the issue was one of first impression: the proper procedure for determining whether an incompetent person must submit to a life prolonging or curative treatment. *Id.* at 835. It sought to provide the decision-maker—the court faced with the petition—with the factors it should consider. *Id.* at 836-38.

In doing so, the court reiterated that the "goal is to do what the ward would do, if she were competent to make the decision." *Id.* at 838. "The goal is not to do what most people would do, or what the court believes is the wise thing to do, but rather what this particular individual would do if she were competent and understood all the circumstances, including her present and future competency." *Id.* at 839. In other words, courts cannot apply a "reasonable person" test, but must

apply a subjective test based on the ward's "attitudes, biases, and preferences." *Id.* at 844.

> RCW 7.70.065(1)(c) speaks directly to a guardian's duties. It requires that

> [b]efore any person authorized to provide informed consent on behalf of a patient not competent to consent under RCW 11.88.010(1)(e), other than a person determined to be incapacitated because he or she is under the age of majority and who is not otherwise authorized to provide informed consent, exercises that authority, *the person must first determine in good faith that that patient, if competent, would consent to the proposed health care.* If such a determination cannot be made, the decision to consent to the proposed health care may be made only after determining that the proposed health care is in the patient's best interests.

(Emphasis added.) In addition, RCW 11.92.190 speaks to placing an incapacitated person in institutional care. It mandates that

> [n]o residential treatment facility which provides nursing or other care may detain a person within such facility against their will. Any court order, other than an order issued in accordance with the involuntary treatment provisions of chapters 10.77, 71.05, and 72.23 RCW, which purports to authorize such involuntary detention or purports to authorize a guardian or limited guardian to consent to such involuntary detention on behalf of an incapacitated person shall be void and of no force or effect.

In light of RCW 7.70.065(1)(c), RCW 11.92.190, and Ida's preferences expressed when competent, Raven determined that she could not pursue an out-of-home placement for Ida.

The Court of Appeals, however, concluded that the neglect finding was appropriate because Raven declined to pursue placement in a residential setting. "In failing to aggressively pursue transitioning Ida from home care to residential care, Raven was not balancing Ida's wishes against her medical needs; rather, she was allowing Ida's historical opposition to residential care to override her critical

medical needs." *Raven*, 167 Wn. App. at 467. The Court of Appeals further explained its view:

> This failure to balance Ida's needs against her stated desires is particularly egregious when Raven knew or should have known that Ida's rejection of medical care in 2004 was based on Ida's delusions that the caregivers were "imposters," that her husband had fled to California, that the emergency room doctor was not a doctor, and that St. Peter's hospital was not St. Peter's hospital. Giving weight to Ida's principled decisions about the kind of care she would want if competent does not include allowing her delusions to control the care she actually needed. This is not a situation where the guardian had to choose between a treatment with a high chance of success that would cause permanent disability or a treatment with lower odds of success without the disability. *See In re Guardianship of Ingram*, 102 Wash.2d 827, 829, 689 P.2d 1363 (1984). Rather, the decision here was whether to continue with the failing home care program or more aggressively pursue the alternative institutional care Ida needed.

*Id.* Raven urges this court to disapprove of the Court of Appeals decision to the extent it suggests that guardians must institutionalize their wards or risk neglect findings.

We agree with Raven. The Court of Appeals' reasoning is in tension with the guidance provided under *Ingram* and RCW 7.70.065. While evidence indicates that Ida had some delusions about institutional care settings, DSHS found that Raven in good faith determined that Ida, when competent, had consistently rejected traditional medical methods and had always expressed a preference to die at home with minimal medical intervention. A reviewing court cannot second guess this unchallenged finding of fact.

The Court of Appeals' opinion suggests that Raven "should have continued to test the strength of Ida's opposition [to a nursing home placement] when it became obvious that in-home care could not cope" with her medical needs. *Raven*,

167 Wn. App. at 458. DSHS takes up this thread, arguing that nothing in the record indicates Raven based her belief that Ida opposed a permanent nursing home placement on anything other than Ida's historic opposition to such an arrangement. Suppl. Br. of Resp't at 16. But as noted, RCW 7.70.065's substitute judgment provision requires the guardian to determine what the ward would want if competent. If that determination cannot be made, then the guardian may act in the ward's best interests, which here likely favored placement in a nursing home.

Because it is established that Raven made a good-faith determination about what Ida wanted if competent, it matters little whether Raven based her determination on historic or contemporaneous facts (or both). The finding is that Ida did not want to be placed in long-term care. DSHS insists that Raven should have asked Ida at certain points—when her pressure sores were at their worst, for example—whether she had reconsidered her opposition to a nursing home. Suppl. Br. of Resp't at 16. Ida's continued hostility and violence toward her caregivers, as demonstrated in this record, belies the suggestion she would have been willing to accept a permanent nursing home placement if only Raven had asked her about it. Indeed, the review judge concluded that it was speculative and not supported by substantial evidence to assume that Ida would have eventually agreed to placement if Raven had spent more time building rapport with Ida. AR at 149.[9] As the *Ingram* court stated, it does not matter whether the ward's choice might not be

_____

[9] DSHS also argues that Raven was remiss in not asking Ida whether she would agree to a temporary placement. This is a separate issue from a permanent nursing home placement and is addressed in the section below.

what most people would do or find prudent. To the extent that the Court of Appeals' discussion is at odds with *Ingram* and RCW 7.70.065, we reject it.

Moreover, even if Raven had chosen to disregard her good-faith determination of Ida's judgment in this matter, Raven could not have placed Ida in a nursing home. RCW 11.92.190 prevents any person, whether competent or not, from being placed against their will in a residential treatment facility unless they have been involuntary committed under chapters 10.77, 71.05, and 72.23 RCW. As noted, Raven pursued a possible involuntary commitment in late 2006, but the designated mental health professional who assessed Ida determined she did not fit the criteria for involuntary commitment.

In sum, DSHS made a finding of fact that Raven determined in good faith that a permanent nursing home placement was against Ida's wishes, and nothing in the record suggests that Ida had changed her mind. Raven therefore acted consistently with both RCW 7.70.065 and RCW 11.92.190 by not pursuing such an arrangement. To the extent that the Court of Appeals affirmed the neglect finding based on Raven's decision not to pursue out-of-home placement, this was in error. In light of RCW 7.70.065 and RCW 11.92.190, Raven's good-faith determination that an out-of-home placement is contrary to Ida's wishes cannot serve as the basis for a finding of neglect.[10]

---

[10] We also note that a finding of neglect against a guardian is not DSHS's only avenue of recourse. The Certified Professional Guardian Board also monitors the activities of guardians and can initiate disciplinary proceedings against those who fall short of the certified professional guardian standards. DSHS may also seek a protective order against a guardian under RCW 74.34.110.

B.  Substantial evidence does not support the finding that Raven's conduct constituted neglect

The DSHS review judge concluded that once Raven committed to in-home care for Ida, Raven had a duty to ensure Ida's needs were met in the home. AR at 162. The review judge's conclusion that Raven failed to do so constituted the grounds upon which he rested his order affirming the finding of neglect. AR at 168 (Conclusion of Law 56).

Specifically, he found that Raven failed to: educate herself on and regularly explore residential alternatives; educate herself on Ida's medical conditions and needs (specifically, her need for repositioning); make an adequate number of meaningful, in-person visits to Ida's home; and pursue independent providers as a care solution or, alternatively, step aside as guardian if supervising independent providers were beyond the scope of Raven's abilities. AR at 163-68. These failings, concluded the review judge, resulted in Ida's inadequate pain management, inadequate repositioning, and inadequate personal bath care for several months. *Id.* at 168. The review judge concluded that Raven's "failure to ensure these critical care needs were met did constitute a pattern of conduct or inaction that failed to provide the services to maintain Ida's physical health and failed to avoid and prevent physical harm to her." *Id.* (Conclusion of Law 56).

In response, Raven argues that her efforts were frustrated by factors beyond her control, most notably the dearth of qualified care providers able to fulfill the care hours authorized by DSHS and Ida's own combativeness and resistance to care. Having concluded that Raven's decision not to pursue an out-of-home

placement for Ida does not support a finding of neglect, we must decide whether substantial evidence supports the conclusion that Raven's other conduct rose to the level of neglect.

We begin by reviewing a guardian's fiduciary duty to her ward. A guardianship is "'a trust relation of the most sacred character.'" *In re Guardianship of Eisenberg*, 43 Wn. App. 761, 766, 719 P.2d 187 (1986) (quoting 39 AM. JUR. 2D *Guardian and Ward* § 1 (1968)). A guardian owes a fiduciary duty to her ward. *Id.*; *Cummings v. Guardianship Servs. of Seattle*, 128 Wn. App. 742, 755, 110 P.3d 796 (2005). A fiduciary duty means that "one party 'occupies such a relation to the other party as to justify the latter in expecting that his interests will be cared for.'" *Liebergesell v. Evans*, 93 Wn.2d 881, 889-90, 613 P.2d 1170 (1980) (quoting RESTATEMENT OF CONTRACTS § 472(1)(c) (1932)).

The enumerated duties of a guardian are set forth in RCW 11.92.040 and RCW 11.92.043. A guardian must, "[c]onsistent with the powers granted by the court, . . . care for and maintain the incapacitated person in the setting least restrictive to the incapacitated person's freedom and appropriate to the incapacitated person's personal care needs, [and] assert the incapacitated person's rights and best interests." RCW 11.92.043(4). In addition to this statutory mandate, a certified professional guardian's conduct is governed by the *Standards of Practice Regulations* for certified professional guardians (CPG Standards).

Just as the review judge, we evaluate the claim of neglect against the backdrop of the CPG Standards. With these standards in mind, we consider first

-18-

whether the review judge correctly concluded that Raven failed to meet her professional standards and then whether those shortcomings amounted to neglect. While it is a close question, we conclude the finding of neglect is unsupportable.

*1. Raven's Conduct as a Guardian*

Under CPG standard 404.5, "[t]he guardian shall, to the extent possible, select residential placements which enhance the quality of life of the incapacitated person, provide the opportunity to maximize the independence of the incapacitated person, and provide for physical comfort and safety." AR at 1836 (Ex. 38 at 4).[11] Under CPG standard 404.7, "[t]he guardian shall, as necessary, thoroughly research and evaluate the incapacitated person's residential alternatives." *Id.* The review judge concluded Raven did not abide by these standards: Ida received substandard care for many of the months when Raven was her guardian, and Raven shared a lack of knowledge about residential alternatives that may have been legally permissible, such as general inpatient admission to a hospital or a rehabilitation treatment center. AR at 163-64 (Conclusion of Law 48).

CPG standard 405, et al., requires the guardian to provide informed consent for medical care on behalf of the ward. AR at 1836 (Ex. 38, at 4). The review judge reasoned that informed consent means Raven had a duty to be knowledgeable about Ida's medical conditions. AR at 164 (Conclusion of Law 49). He concluded that she failed in this duty as evinced by her testimony

---

[11] We cite to the administrative record for the text of the standards because since the time of the hearing, the standards have been renumbered. The parties' briefing cites to the standards as they were numbered at the time of the hearing.

demonstrating that she had only a vague understanding of Ida's need for repositioning to avoid bedsores, and of bedsores in general, and did not know how often Ida was being repositioned. *Id.* The review judge noted that Raven's minimal visits with Ida contributed to her lack of understanding regarding Ida's medical needs.

Under CPG standard 401.15, the guardian must have meaningful, in-person contact with her client as needed, including observing the incapacitated person's circumstances and interactions with care providers. AR at 1834 (Ex. 38, at 2). The review judge opined that Raven fell far short of this standard, finding that Raven visited Ida only five times in 2006, and only twice that year in Ida's home. AR at 112-13 (Finding of Fact 44). The review judge concluded that because Raven "insulated herself from Ida's quickly deteriorating condition by failing to personally observe the situation in late 2006, the necessary care decisions were not made." AR at 167 (Conclusion of Law 53).

CPG standard 401.6 requires the guardian to "know and acknowledge personal limits of knowledge and expertise" and to "assure that qualified persons provide services to the incapacitated person." AR at 1833 (Ex. 38, at 1). Raven failed in this duty, the review judge concluded, when she chose not to pursue independent providers because she was not experienced in supervising such staff. Alternatively, the review judge opined that Raven had a duty under CPG standard 407.2 to terminate her guardianship when it became clear she could not procure a primary care physician or find enough staff to carry out Ida's care plan.

Turning now to whether the review judge correctly determined that Raven fell short of these standards, we first consider the review judge's general proposition that having chosen in-home care for Ida, Raven had a duty to *ensure* Ida received the goods and services she needed. The review judge did not identify any law or standard that required Raven to *ensure* or guarantee that Ida accepted the care Raven could arrange for Ida in Ida's home. Raven was required to care for and maintain Ida in the setting least restrictive to Ida's freedom and appropriate to her personal care needs and to assert Ida's rights and best interests. RCW 11.92.043(4). As found by DSHS, Ida's preference if competent was to remain at home to die. This arrangement was least restrictive to Ida's freedom and asserted her rights.

There was nothing inherently inappropriate about this arrangement with regard to Ida's personal care needs; had Ida been cooperative with the repositioning program, nothing in the record suggests she would have developed the serious bedsores she did. Indeed, the record reflects periods of time when Ida did not suffer from sores, suggesting periods when the care arrangement was "working" even without the additional aide hours being filled and without repositioning every two hours. For example, the findings of fact, which give a detailed account of Ida's battle with pressure sores, make no mention of sores after January 2006 until November 2006. The record also does not suggest that Raven's decisions to stay the course with the care plan were not made in good faith or were not made with Ida's best interests in mind. For example, Raven determined that

Ida had a good relationship with one of CCS's primary caregivers, Pam Hernandez, and that it was in Ida's best interests to make the care plan work with CCS as the staffing agency. AR at 132-33 (Finding of Fact 86).

Neither did CPG standard 404.5 impose on Raven a duty to ensure Ida accepted the services offered under her plan of care in the home. *See* AR at 1836 (Ex. 38, at 4). CPG standard 404.5 required Raven to select residential placements that provide for physical comfort and safety *to the extent possible*. This does not require a guardian to succeed in overcoming problems with staffing beyond the guardian's control, such as staffing shortages, the ward's extreme resistance to care, or obstructionist tendencies by a ward's family. As both Raven and amici argue, endorsing DSHS's view that Raven had a duty to *ensure* Ida accepted the care that was offered sets up an untenable standard for guardians akin to strict liability. *See, e.g.*, Br. of Amicus Curiae Washington Academy of Elder Law Att'ys at 11. We reject the suggestion that guardians have a duty to ensure their wards accept the care provided to them.

As to the remaining duties identified by the review judge, as noted, the review judge misinterpreted CPG standard 404.5 when he concluded Raven had failed to secure a residential placement that met Ida's needs. Again, CPG standard 404.5 required Raven to select residential placements that provide for physical comfort and safety to the extent possible. She did so. It was beyond her control that the care agency could not fill all Ida's staffing hours, particularly where the

record indicates it was unlikely any care agency could have done so. AR at 132 (Finding of Fact 84-85).[12]

The review judge was correct that Raven had a duty to research and evaluate residential placement alternatives. And the evidence substantially supports his view that Raven failed to carry out that duty. It appears from the record that she never asked about whether there were temporary placement options short of permanent residential placements that might have provided more care. *See, e.g.*, Administrative Report of Proceedings (ARP) at 670 (testimony of Raven). The judge was also correct that Raven had a duty to provide informed medical consent on Ida's behalf, and substantial evidence supports his finding that Raven had only a vague knowledge of Ida's medical needs. *See, e.g.*, ARP at 668, 725-26 (testimony of Raven). Likewise, the review judge correctly invoked CPG standard 401.15, requiring a guardian to have meaningful in-person contact with her ward, including in-home visits. Substantial evidence supports the review judge's finding that Raven made minimal visits in 2006, including when Ida was experiencing significant medical issues. The optimal number of visits for a guardian is based on the unique circumstances of the situation, but Raven's guardianship expert

---

[12] DSHS argues that in June 2006 "another agency expressed interest in working with Ida, but Raven decided to continue using CCS." Suppl. Br. of Resp't at 11. Although the record does indicate that Raven had talked with another agency about providing care, nothing in the record indicates if that agency actually had the staff to fulfill Ida's hours or the staff willing to work on weekends or after 5 p.m., which were the difficult slots to fill for Ida. *See* AR at 132 (Finding of Fact 85). The record does demonstrate that that same agency DSHS identifies as being available in June 2006 was *not* able to provide staffing in December 2006 at CCS's request. *See* AR at 876 (Ex. 10, at 58); ARP at 593.

acknowledged that Raven would "have been better off" if she had seen Ida more frequently, somewhere in the order of at least once a month. ARP at 643 (testimony of Thomas O'Brien).

However, the review judge erred when he concluded that Raven failed a duty to pursue independent providers for Ida or a duty to step aside as guardian so that someone could be appointed who would supervise independent providers. Ironically, Raven's decision not to pursue the option of independent providers was consistent with CPG standard 401.6, which required her to acknowledge her personal limits. DSHS made an express finding that it was speculative whether independent providers would have been available had Raven pursued the option, let alone made a difference in Ida's care given her resistance to caregiving. AR at 122-23. In addition, the review judge's citation to CPG standard 407.2 to support his conclusion that Raven should have stepped aside if she did not feel comfortable supervising independent providers is unavailing. CPG standard 407.2 is applicable to scenarios in which circumstances have changed such that the guardianship itself must be terminated, i.e., the incapacitated person is no longer incapacitated. It does not require a guardian to terminate her representation as guardian because she decides not to pursue a course of action, whose success is speculative at best, outside her knowledge and expertise.

Thus, we are left with three findings of fact and conclusions of law as to Raven's duties and failings that are supported in fact and law: that Raven failed, under the CPG Standards, in her duty to adequately research and regularly review

Ida's residential options; failed in her duty to become and stay informed as to Ida's medical needs; and failed in her duty to make meaningful, in-person contacts with Ida that allowed her to observe Ida's circumstances and interactions with caregivers. We must decide whether these failures amount to neglect under RCW 74.34.020(12), as addressed below.

*2. Raven's shortcomings as a guardian and the neglect standard*

DSHS concluded that Raven's failings as a guardian amounted to neglect using the "pattern of conduct" prong of the neglect definition, which defines neglect as

> a pattern of conduct or inaction by a person or entity with a duty of care that [(1)] fails to provide the goods and services that maintain physical or mental health of a vulnerable adult, or that [(2)] fails to avoid or prevent physical or mental harm or pain to a vulnerable adult.

RCW 74.34.020(12)(a).[13] We cannot disturb this determination unless, as Raven argues, we determine that the review judge erroneously interpreted or applied the law, or the decision is not supported by evidence that is substantial when viewed in light of the record. Under this standard, we conclude that DSHS's review judge erred in finding a pattern constituting neglect because the conclusion is not supported by substantial evidence.

---

[13] DSHS did not rely on the alternative definition of neglect, "an act or omission that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100." RCW 74.34.020(12)(b).

As noted, substantial evidence in the record supports the review judge's factual conclusions that Raven failed, under the CPG Standards, in her duty to adequately research and regularly review Ida's residential options, failed in her duty to become and stay informed as to Ida's medical needs, and failed in her duty to make meaningful, in-person contacts with Ida that allowed her to observe Ida's circumstances and interactions with caregivers.

But these instances do not sustain a finding of neglect under RCW 74.34.020(12)(a). This record does not establish that Raven's conduct—while lacking in many respects from a professional standpoint—failed to provide the goods and services needed to maintain Ida's physical health or that her conduct resulted in physical or mental harm or pain to Ida.

As to the first subsection of the definition, because we conclude that under this record Raven had no duty to pursue independent providers, Ida was offered the goods and services that were reasonably available to her—that is, the agencies serving her were providing as much staff as they could. AR at 132 (Findings of Fact 84-85). There is no finding of fact that Raven denied Ida medical attention when she required it. As to Raven's failure to explore alternative residential placements, it is likely true that Ida would have had round-the-clock access to goods and services in an out-of-home placement, but again, she had the goods and services reasonably available in the setting least restrictive to her freedom and in accordance with her wishes.

The question of whether Raven's conduct failed to avoid or prevent physical harm to Ida is closer. As to Raven's failure to explore alternative temporary placements, it is true that Ida's bedsores improved at the rehabilitation facility that she entered following the last severe bout with bedsores in December 2006. But, Ida also died there, and thus we do not know what would have happened had she returned home. Even when at home Ida went through periods where her skin issues resolved and periods where they were acute. The record gives no reason to conclude that pattern would not have continued even after Ida had returned from a temporary placement outside the home. Nor is there evidence that Raven's inadequate knowledge about the treatment of bedsores resulted in a failure to take steps recommended by Ida's medical care providers when needed. And, there is evidence that staffing issues and Ida's combative behavior were getting in the way of her care plan, which is unconnected in this record to Raven's lack of knowledge about bedsores.

Finally, the infrequency of Raven's in-person visits is very troubling. But the record reflects Raven was in regular contact with Ida's caregivers and their supervisors. Given that Raven was not herself a caregiver, and given that Raven demonstrated attentiveness to the concerns and recommendations of the caregivers, this record evinces no nexus between her infrequent visits and Ida's deterioration.

To be clear, the plain language of RCW 74.34.020(12) does not require that the alleged perpetrator of neglect be the only actor with problematic conduct. But the statute does require that the alleged perpetrator's actions or conduct fail to

provide goods or services, or avoid harm to the ward. This is not a tort causation standard, but it plainly requires a nexus. On this record, there is not substantial evidence demonstrating that among the many forces at play here, Raven's shortcomings as a guardian resulted in a failure to provide goods or services or avoid harm to Ida. On the contrary, despite several professional missteps, the evidence indicates that Raven was reasonably diligent in securing Ida's medication, services from doctors and other health professionals, and worked with the care agencies on the staffing shortfalls.[14]

C.   Raven is not entitled to attorney fees

The superior court that heard Raven's administrative appeal awarded her attorney fees under the EAJA. Under that statute, "a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, *unless the court finds that the agency action was substantially justified* or that circumstances make an award unjust." RCW 4.84.350(1) (emphasis added). "'Substantially justified means justified to a degree that would satisfy a reasonable person.'" *Silverstreak, Inc. v. Dep't of Labor & Indus.*, 159 Wn.2d 868, 892, 154 P.3d 891 (2007) (quoting *Moen v. Spokane City Police Dep't*, 110 Wn. App. 714, 721, 42 P.3d 456 (2002)). And, an action is substantially justified if it had a reasonable basis in law and in fact. *Aponte v. Dep't of Soc. & Health Servs.*, 92 Wn. App. 604, 623, 965 P.2d 626 (1998)

---

[14] Given our resolution of this case, we need not address Raven's remaining contention about whether harm must be shown under RCW 74.34.020(12)(a).

(quoting *Sneede v. Coye*, 856 F. Supp. 526, 530-31 (N.D. Cal. 1994)). That is, it need not be correct, only reasonable. *Pierce v. Underwood*, 487 U.S. 552, 566 n.2, 108 S. Ct. 2541, 101 L. Ed. 2d 490 (1988). A trial court's award of attorney fees under the equal access to justice act is reviewed for abuse of discretion. *Plum Creek Timber Co. v. Wash. State Forest Practices Appeals Bd.*, 99 Wn. App. 579, 595, 993 P.2d 287 (2000) (citing RCW 4.84.350). A trial court abuses its discretion when it makes a decision that is manifestly unreasonable, based on untenable grounds, or based on untenable reasons. *Moreman v. Butcher*, 126 Wn.2d 36, 40, 891 P.2d 725 (1995); *see Plum Creek Timber Co.*, 99 Wn. App. at 595-96 (noting an agency's decision-making process "'involves the balancing of sensitive, sometimes competing or conflicting interests in a controversial area and requires analysis of close questions on which there is no clear precedent on point'").

An agency action that is arbitrary and capricious is not substantially justified. *Puget Sound Harvesters Ass'n v. Dep't of Fish & Wildlife*, 157 Wn. App. 935, 952, 239 P.3d 1140 (2010). On the other end of the spectrum, RCW 4.84.350(1) contemplates that an agency action may be substantially justified, even when the agency's action is ultimately determined to be unfounded. This may occur, for example, when the agency's determination, though ultimately unsupported by the evidence, was made on the best available evidence at the time of the decision. *Kettle Range Conservation Grp. v. Dep't of Natural Res.*, 120 Wn. App. 434, 469-70, 85 P.3d 894 (2003).

Here, the superior court concluded DSHS's actions were not substantially justified. The court's order did not offer any reasons for its conclusion. Clerk's Papers at 94. In the absence of an explanation by the trial court for its ruling, and in light of the record here, we must conclude that the trial court made an untenable decision. Regardless of whether Raven's conduct amounted to neglect, the record is clear that Raven exhibited several significant shortcomings as a guardian. More to the point, under the facts here, an agency would be reasonable in pursuing the same course of conduct that DSHS followed. Part of the justification for a fee-shifting statute like the EAJA is that the legislature wants to "ensure citizens a better opportunity to defend themselves from *inappropriate* state agency actions." *Costanich v. Dep't of Soc. & Health Servs.*, 164 Wn.2d 925, 929, 194 P.3d 988 (2008) (emphasis added). We are wary of upholding a fee judgment that suggests the sort of facts we are faced with here do not create substantial justification to pursue a neglect finding, particularly where there has been no determination that DSHS's actions were arbitrary, willful, or capricious.

Accordingly, although Raven is the prevailing party in this action, we conclude DSHS's action was substantially justified, reverse the trial court's award of fees at that level, and reject Raven's request for fees before this court.

## CONCLUSION

This case poses a difficult set of facts in which it is undeniable that Ida's last years were not comfortable or dignified. As DSHS recognized, "one could not script a more trying case for caregivers, family members, public and private care

agencies, courts, and guardians than the one at hand." AR at 158. And it is without question that Raven could have made better decisions in some areas and that she exercised poor judgment in meeting her mandates under professional standards in others. But the evidentiary record here cannot sustain a finding that these failings amounted to neglect on Raven's part under RCW 74.34.020(12)(a). Accordingly, we reverse DSHS's finding of neglect against Raven. As to attorney fees, we reverse the superior court and hold that DSHS's action against Raven, while ultimately unsupported, was substantially justified, and that Raven is not entitled to attorney fees.

_(signature)_

WE CONCUR:

Madsen, C. J.

_(signature)_

_(signature)_

Fairhurst, J.

J. M. Johnson

Wiggins, J.

González, J.

Gordon McCloud, J.