# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Detention of: G.S., | No.  53766-4-II |
| STATE OF WASHINGTON, | |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| G.S., | |
| Appellant. | |

SUTTON, A.C.J. — GS appeals the superior court's 180-day order of involuntary commitment.  GS argues that (1) the superior court entered insufficient written findings of fact for appellate review, and (2) the State failed to prove by clear, cogent, and convincing evidence that GS had a recent proof of loss of cognitive or volitional control, and thus, continued to be gravely disabled as a result of a mental disorder under former RCW 71.05.020(22)(b) (2018).[1],[2]  We hold that (1) the superior court's written findings of fact are sufficient for appellate review, but (2) the State did not prove by clear, cogent, and convincing evidence that GS was gravely disabled as a

---

[1] LAWS OF 2018, ch. 201 § 3001.

[2] GS argues that this appeal is not moot and should be considered on its merits.  The State agrees. We previously held that an appeal involving involuntary commitment was not moot because prior involuntary commitment orders have potential collateral consequences.  *In re Det. of BM*, 7 Wn. App. 2d 70, 76-77, 432 P.3d 459 (2019).

result of a mental disorder under former RCW 71.05.020(22)(b). We reverse the superior court's order of commitment.

FACTS

In April 2019, GS was involuntarily committed by the Snohomish County Superior Court after he stipulated to the State's allegation that he was gravely disabled as a result of a mental disorder. He was remanded to the custody of the Department of Social and Health Services and transferred to Western State Hospital. On July 3, 2019, GS's doctors filed a petition for 180-day involuntary commitment, arguing that GS continued to be gravely disabled as a result of a mental disorder. The court commissioner held a hearing on the petition August 5.

GS's treating psychiatrist, Dr. Leslie Sziebert, testified. Dr. Sziebert diagnosed GS with schizophrenia. Dr. Sziebert noted GS's symptoms to include hallucinations, agitation, and paranoia. Throughout Dr. Sziebert's testimony, GS interrupted him with "objections" and accused Dr. Sziebert of lying. Dr. Sziebert also believed that GS lacked cognitive and behavioral control, but did not testify to any recent proof of loss of cognitive or volitional control by GS. Dr. Sziebert opined that GS would only be able to function in the community if he were to "put his family members in a bind to try to rescue him." Verbatim Report of Proceedings (VRP) at 8-9.

Dr. Sziebert also testified as to GS's history.[3] Before his hospitalization at Western State Hospital, GS was living in a camper on his mother's property in Snohomish County, but he began to violate house rules, and his mother confronted him. GS then "hitchhiked . . . to Gig Harbor and was living under a bridge." VRP at 10. GS's mother picked him up, and he was then detained

---

[3] The superior court admitted the evidence under ER 703 to support Dr. Sziebert's basis for his opinion, but it was not admitted for the truth of the matter asserted.

based on his "demonstrating hallucination disorder." VRP at 10-11. GS had six involuntary hospitalizations in the prior three years.

Dr. Sziebert testified to GS's history of medication noncompliance during his current hospitalization. Dr. Sziebert believed GS was "cheeking" his medications and disposing of them, so the hospital began crushing his medications. "Cheeking" means "a patient puts the intact pill [inside their] cheek . . . or under their tongue," and then later spits the medication out. VRP at 12. Once GS began taking crushed medication, Dr. Sziebert noticed "some improvement" in his behavior. VRP at 12.

Dr. Sziebert testified that GS was active in the treatment groups when he first began his hospitalization in March 2019, but that he had "pretty much stopped" going to the groups since early July 2019. VRP at 12. Dr. Sziebert testified that participation in these groups was part of assessing whether a patient is ready for discharge. Dr. Sziebert did not believe that GS accepted his diagnosis or his need for treatment.

Based on GS's diagnosis, current symptoms associated with his diagnosis, history of medication noncompliance, lack of participation in treatment, and denial of his diagnosis and need for treatment, Dr. Sziebert did not believe that if release, GS could independently make a choice to continue psychiatric treatment. Dr. Sziebert opined that if released, GS would stop taking his medications resulting in another cycle of being decompensated and ultimately being detained.

GS also testified. He stated that he did not believe his continued hospitalization was beneficial. He denied experiencing hallucinations. GS described a detailed "healthy plan" for receiving treatment if released. VRP at 27. GS claimed that he believed he had a mental illness, but disagreed with Dr. Sziebert's diagnosis of schizophrenia. GS stated that his medications were

3

helping and he had not experienced symptoms during the past month. GS also confirmed that he was previously hospitalized after he stopped taking his medications, and that he was living under a bridge when his mother picked him up.

The superior court orally ruled that GS was gravely disabled under former RCW 71.05.020(22)(b).

> This Court does find that there is clear, cogent, and convincing evidence that [GS] remains gravely disabled under prong [b] only at this time.
>
> [GS] appears to be seeing to the primary parts of his [activities of daily living] and would have an ability to properly see to some of his own needs.
>
> The Court is concerned about the escalating cognitive and volitional control based on the records that I've heard testified to as well as the doctor's observations as well as this Court's observations in this courtroom, it is –
>
> . . . .
>
> -- this Court's finding that [GS] would have – he would have a difficult time maintaining that cognitive and volitional control outside the setting of an extremely structured setting.
>
> [GS had] only recently been more [] compliant [with his medications], and he [was] only . . . minimally participat[ing] in treatment.
>
> Until some of that happens – and it appears that he is not fully cognitively accepting of the mental health diagnosis that was based on his testimony as well as the testimony of the doctor.
>
> So I am finding [GS] gravely disabled. I am finding that there [is] just cause to hold him for up to 180 days.

VRP at 36-37.

4

The court subsequently entered written findings of fact and conclusions of law and

incorporated its oral ruling by reference. The court found that:

> 2. Reason/s for Commitment. [GS] suffers from a mental disorder. The diagnosis is 298.9 Unspecified Schizophrenia Spectrum and Other Psychotic Disorder.
>
> Is/Continues To Be Gravely Disabled and Respondent:
>
> . . . .
>
> as a result of a mental disorder manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over actions, is not receiving such care as is essential for health and safety.

Clerk's Papers (CP) at 18 (boldface omitted). The court summarized both Dr. Sziebert's and GS's

testimony from the hearing. The court found that a less restrictive alternative was not appropriate:

> [GS] has had non-compliance with medications and is now on medication watch. He is refusing to attend treatment sessions. This would lead the doctor to conclude he would not succeed in the community at this time.
>
> [GS] will need to be in control of his agitation without having to take additional medication to suppress this. He would need to care for personal hygiene, attend groups, and admit to mental health diagnosis.

CP at 19.

The court noted that Dr. Sziebert testified that GS had a "[h]igh risk of decompensation if

released at this time" and that less restrictive alternatives were not recommended. CP at 19. Based

on these findings, the court concluded that GS was gravely disabled as a result of a mental disorder

under former RCW 71.05.020(22)(b) and ordered involuntary treatment up to 180 days.

GS appeals.

ANALYSIS

I. FINDINGS OF FACT-SUFFICIENCY FOR REVIEW

GS argues that the superior court's written findings of fact are inadequate for meaningful appellate review, and thus, the 180-day commitment order should be reversed. We hold that the superior court's written findings of fact are sufficient for appellate review.

Findings of fact are required following an involuntary commitment hearing. MPR 3.4(b). A superior court's written findings of fact "should at least be sufficient to indicate the factual bases for the ultimate conclusions." *In re Det. of LaBelle*, 107 Wn.2d 196, 218, 728 P.2d 138 (1986). "The purpose of the requirement of findings and conclusions is to insure the [superior] judge 'has dealt fully and properly with all the issues in the case before . . . decid[ing] it'" and so, on appeal, we "'may be fully informed as to the bases of [the] decision when it is made.'" *LaBelle*, 107 Wn.2d at 218-19 (internal quotation marks omitted) (quoting *State v. Agee*, 89 Wn.2d 416, 421, 573 P.2d 355 (1977)). "Even if inadequate, written findings may be supplemented by the [superior] court's oral decision or statements in the record." *LaBelle*, 107 Wn.2d at 219.

Here, the superior court's written findings incorporated its oral ruling and noted that it found that GS was gravely disabled under former RCW 71.05.020(22)(b). But the written findings of fact did little more than summarize the hearing testimony given by Dr. Sziebert and GS. Based on these findings, the court concluded that GS continued to be gravely disabled under the prong (b) definition.

GS analogizes this case to *In re Det. of GD*, 11 Wn. App. 2d 67, 72-73, 450 P.3d 668 (2019). In *Det. of GD*, the superior court only made check-the-box findings without additional findings. 11 Wn. App. 2d at 72-73. The superior court here added the testimony from the hearing

to its findings, and while those findings are not particularly helpful, they were sufficiently detailed for our review.

GS also argues that "mere recitation of testimony, without assessment of credibility . . . to tie such testimony to the appropriate legal standard, is inadequate." Br. of Appellant at 21-22. However, as the State correctly points out, "no court has held that summarizing testimony alone is grounds for reversal." Respondent's Br. at 18.

We hold that the findings of fact, although minimal, are sufficient for appellate review.

## II. GRAVELY DISABLED

GS argues that the State failed to prove by clear, cogent, and convincing evidence that GS had a recent proof of loss of cognitive or volitional control, and thus, was gravely disabled as a result of a mental disorder under former RCW 71.05.020(22)(b).[4] We agree and hold that the State did not prove by clear, cogent, and convincing evidence that GS had a recent proof of loss of cognitive or volitional control and was gravely disabled as a result of a mental disorder, and thus, the court's findings were not supported by substantial evidence.

A. LEGAL PRINCIPLES

A person who is currently in involuntarily committed can be recommitted involuntarily at the end of the commitment period for up to an additional 180 days if he or she continues to be

---

[4] GS argues that this court should disregard the superior court's "references to the commitment petition in considering whether the evidence supports a determination of grave disability." Br. of Appellant at 32-33. The superior court did not make findings based solely on references to the State's petition, but based its findings on the evidence and testimony presented at the hearing.

gravely disabled. RCW 71.05.320(4)(d), (6).[5] Former RCW 71.05.020(22) defines "gravely disabled" as a condition in which a person, because of a mental disorder, "(b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety."

The court in *LaBelle* stated:

Implicit in the definition of gravely disabled . . . is a requirement that the individual is *unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment. This requirement is necessary to ensure that a causal nexus exists between proof of severe deterioration in routine functioning" and proof that the person so affected is not receiving such care as is essential for his or her health or safety.

107 Wn. 2d at 208 (quoting former RCW 71.05.020(1)(b) (1986)).

*LaBelle* also explained that the statute, then former RCW 71.05.020(1)(b), incorporated the definition of "decompensation," meaning that to continue to involuntarily commit an individual under the prong (b) definition, the State must prove the individual's progressive deterioration of routine function supported by evidence of repeated or escalating loss of cognitive or volitional control of actions. *LaBelle*, 107 Wn.2d at 206.

The second requirement of former RCW 71.05.022(22)(b) is satisfied if the evidence reveals a factual basis for concluding that the individual "is not receiving *or would not receive, if released*, such care as is essential for his or her health or safety." *LaBelle*, 107 Wn.2d at 208 (emphasis added). When considering the second requirement, the court also may consider the

---

[5] The legislature amended this statute in 2020, but subsections (4)(d) and (6) did not change. LAWS OF 2020, ch. 302 § 45. Accordingly, we cite to the current version of the statute.

likelihood that the person would discontinue necessary medications and decompensate. *LaBelle*, 107 Wn.2d at 206.

The State has the burden of establishing grave disability by clear, cogent, and convincing evidence, meaning that the ultimate fact at issue is shown to be "highly probable." *LaBelle*, 107 Wn.2d at 209. We "will not disturb the [superior] court's findings of 'grave disability' if [the findings are] supported by substantial evidence which the lower court could reasonably have found to be clear, cogent[,] and convincing." *LaBelle*, 107 Wn.2d at 209. Substantial evidence is evidence that is "supported by 'a sufficient quantity of evidence to persuade a fair-minded person of [the order's] truth or correctness.'" *Raven v. Dep't of Soc. & Health. Servs.*, 177 Wn.2d 804, 817, 306 P.3d 920 (2013) (alteration in original, internal quotation marks omitted) (quoting *Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wn.2d 568, 588, 90 P.3d 659 (2004)).

B. FAILURE TO SATISFY FIRST REQUIREMENT OF FORMER RCW 71.05.020(22(b)

Dr. Sziebert testified that GS had about six involuntary hospitalizations over the previous three years. Both Dr. Sziebert and GS testified that GS had discontinued his medications in the community, resulting in his current involuntary commitment. Dr. Sziebert also testified that he believed GS was "cheeking" his mediations, which led to the hospital instituting a watch and crush order about one month before the hearing to ensure that GS took his medications. GS exhibited some improvement during the month after the hospital began crushing his medications, but he still showed symptoms of his mental disorder, including agitation, paranoia, and hallucinations. Dr. Sziebert testified that GS had not attended most of the active treatment groups for about two months. Further, Dr. Sziebert did not believe GS would receive proper care if he were released and that he was at high risk of decompensating and being redetained.

This evidence is more than sufficient to establish the second requirement of former RCW 71.05.020(22)(b)—that GS would not receive such care as is essential for his health or safety if released. However, none of the evidence at the hearing established *recent* proof of *significant* loss of cognitive or volitional control by GS as required under the statute and *LaBelle*. Neither the State's expert nor the court in its findings and order refer to proof that GS had a significant *recent* decline or loss in cognitive or volitional control as required. In fact, there was evidence showing the opposite—that GS's behavior was beginning to improve in the month before the hearing. Neither the State nor the court addressed the causal nexus required under *LaBelle* and former RCW 71.05.020(22)(b) to show GS had a "severe deterioration of routine functioning by repeated and escalating loss of cognitive or volitional control." *See LaBelle*, 107 Wn.2d at 208. The evidence does not provide clear, cogent, and convincing evidence that GS had a *recent* and significant decline in cognitive or volitional control.

Without evidence demonstrating that GS experienced a recent and significant decline in his cognitive or volitional functions, we hold that the court's findings are not supported by substantial evidence, and they do not support the court's conclusions of law that GS was gravely disabled as a result of a mental disorder under former RCW 71.05.020(22)(b). Because the State failed to meet its burden of proof by clear, cogent, and convincing evidence, we reverse the superior court's 180-day involuntary commitment order.

No. 53766-4-II

CONCLUSION

We reverse the superior court's 180-day involuntary commitment order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Sutton, A.C.J._
SUTTON, A.C.J.

We concur:

_Maxa, J._
MAXA, J.

_Cruser, J._
CRUSER, J.