IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| JEFFRY R. LYTLE,<br><br>    Appellant,<br><br>    v.<br><br>STATE OF WASHINGTON, ADULT PROTECTIVE SERVICES OF THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES,<br><br>    Respondents. | No. 87778-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. — Jeffry Lytle appeals from the review decision by the Department of Social and Health Services (DSHS) Board of Appeals that affirmed the initial determination by the DSHS division of Adult Protective Services that Lytle neglected S, a vulnerable adult. Because substantial evidence supports the Board's findings which, in turn, support the conclusions of law underlying its decision and the Board correctly interpreted and applied the law, we affirm.

FACTS

The following facts, unless otherwise noted, are taken from the findings set forth in the review decision of the DSHS Board of Appeals and are undisputed on appeal.

Lytle lived with his mother, S, in her home in Renton for most of his life. She retired in 1995, at the age of 55. Between 1995 and continuing into 2017, S's

lifestyle gradually worsened. She refused to clean her home or allow others to do so and collected various items that she stacked inside and outside of her house. When several of the rooms became unusable, she stopped going upstairs and instead confined herself to a small area of the living room. She also refused to engage in hygienic behavior, go to the dentist or doctor, or leave the house, while also eating unhealthy food and spending most of her time watching television or playing video games. She slept in a bean bag chair that her sons referred to as her "nest," in which she also stored food and other belongings.

During this time, Lytle assisted S by doing her laundry, shopping, picking up around the house, obtaining food for her, providing transportation for her, assisting her with mobility, and making phone calls. This was, in part, because S had lost her hearing and oftentimes needed Lytle's help to get up from a seated position, and, in 2015, her sons (including Lytle) took away her car keys after she caused a collision while driving.

In April 2017, a referral to the DSHS division of Adult Protective Services (APS) was made regarding S's alleged self-neglect. The referral reported that S "was not going to the doctor or showering, she only ate chocolate chips, she slept on a pile of garbage on the living room floor, and that there was no running water in the home." An APS investigation concluded that S was capable of making her own decisions and had, therefore, engaged in self-neglect. Then, in October 2018, APS received another referral for potential self-neglect. APS Investigator Cynthia Martin began her investigation that month and continued it until January 2019.

On December 24, 2018, S signed a document titled "General Durable Power of Attorney" (DPOA) appointing Lytle as her agent. It read as follows:

> 2.     Effectiveness and Duration. *This Power of Attorney shall become effective immediately upon execution and shall continue in full force and effect throughout my disability or incapacity. A physician's statement is not required regarding my disability* because this document is effective immediately. *Disability shall include the inability to manage* property and *affairs effectively for reasons such as*: mental illness, dementia, mental deficiency, *physical* illness or *disability*, chronic use of drugs or chronic intoxication. . . .
>
> . . . .
> 5.     Powers Not Specifically Enumerated. The Agent shall also have *all powers which may be necessary or desirable to provide for my support*, maintenance, *health, emergencies and urgent necessities*, even if these powers are not specifically set forth in this document.
>
> . . . .
> 7.     Health-Care Decision Making. This Power of Attorney shall not provide the authority for the Agent to override my personal health care decision making so long as I have the capacity to make such decisions. *In case I am incapacitated or disabled, the Agent shall have the power to make health care decisions* and/or provide informed consent for health care decisions on my behalf, *including*
>
> . . .
>> d)     *make determinations regarding my appropriate health care*, including but not limited to, dealing with attending physicians and determining, in the judgment of the Agent, which course of treatment is necessary or desirable.

(Emphasis added) (boldface omitted.)

During this time, according to Martin's report, Lytle told her that he had been named as S's agent in a durable power of attorney document.[1] Her report similarly stated that "[S']s adult son and self-identified [Durable Power of Attorney] agent

---

[1] Lytle's appellate briefing disputes in general whether he had represented to anyone prior to August 7, 2021 that he was named as S's agent in a DPOA document. He does not engage with the portion of Martin's report indicating that he had represented as much to her during her late 2018 and early 2019 investigation, despite Lytle having designated the record containing her report and despite DSHS's response brief that cited to Martin's report in its argument that he had represented himself to Martin as S's agent under DPOA prior to the incident in question.

also resides in the residence and acknowledges [S']s mental deterioration, though recognizes his inability to impose his will on [S] regarding her physical care."  S, for her part, indicated that she was able to take care of herself.  APS closed the investigation in January 2019 with a finding of "[i]nconclusive" as to whether S self-neglected at the time.

Two and a half years later, on August 4, 2021, the following occurred over a span of four days:

> [S] was sitting on the edge of her computer chair when she leaned too far forward and slid to the floor.  After sliding down, [S] asked [Lytle] to help pick her up, *but he was unable to despite multiple attempts*.  [S] stated she was tired and just wanted to sleep.  [Lytle] brought her a blanket and pillow and he assumed it was fine for the night because she normally sleeps on the floor.  [Lytle] thought that after [S] rested she would be able to get up.
> . . .  The next day, August 5, 2021, [*Lytle*] *again tried to assist his mother with getting up off the floor but was again unsuccessful.*  [S] did not seem to mind being on the floor and she just camped out there.  *[Lytle] brought her a cheeseburger, chocolate chips, and root beer*.
> . . .  The following day, August 6, 2021, [*S*] *was still unable to get up and she seemed to be declining.*  [Lytle] asked [S] if she wanted to go to the hospital, but she said no.  [Lytle] considered taking [S] to the hospital against her will, but ultimately did not.
> . . .  Then, on the morning of August 7, 2021, [S] was less lucid and responsive.  This was by far the longest amount of time [S] has been unable to get up.
> . . .  [Lytle] called his brother and the neighbor for moral support.  They all agreed [Lytle] should call 911 and have [S] hospitalized.  [Lytle] called 911 at 4:04 p.m. and Emergency Medical Services (EMS) arrived at 4:10. p.m.

 (Emphasis added) (footnotes omitted).  Shortly thereafter, as later described in the review decision of the DSHS Board of Appeals, Lytle "advised EMS [personnel] that [S] named him as her agent in her power of attorney and provided a copy of

the durable power of attorney to the hospital when his mother was admitted." At the time, S was 81 years old, and Lytle was 60 years old.[2]

Involved EMS personnel and staff at the hospital where S was later admitted sent APS an intake report to investigate potential neglect. APS Investigator Erin Stewart visited the hospital and began her investigation. She, among other things, received and reviewed S's December 2018 DPOA document. The Board's review decision later described her interview with Lytle as follows:

> When asked how long [S] would typically stay down on the floor, [Lytle] responded only hours, never days at a time. [Lytle] explained to Ms. Stewart that most days [S] spent her time sitting in an office chair in the computer room, but that she slept on the floor in a different room. He stated that in the past several years, [S] has had a hard time getting up on her own and she required assistance to get up. Typically, [S] keeps everything in arms reach so she doesn't have to get up often.
> . . . [Lytle] further reported that he did not know [S] soiled herself while sitting on the floor for an extended period and indicated that he did not see feces and that it must have been under her clothing.
> . . . Ms. Stewart spoke with [Lytle] again on August 23, 2021, when she was checking on [S] at the hospital. [Lytle] reported that he was not aware [S] had any pressure wounds on her body. His mother never mentioned anything to him or acted like she was in pain. He said that most days he would help her get up two times per day, help her stand up, and that [S] would ambulate with her walker to and from the computer room.

(Footnotes omitted.) During this time, Stewart attempted to interview S, but S was unresponsive. S remained at the hospital until August 30, when she was discharged to a long-term care facility. She passed away a few months later.

Thereafter, in December 2021, APS notified Lytle of its initial determination that he had neglected a vulnerable adult. Following a two-day administrative

---

[2] S was later diagnosed with "multiple pressure ulcers on her right buttock (stage 4), right elbow (stage 3), and right upper back (stage 3); pressure-induced deep tissue damage of her left heel; severe sepsis; delirium; and unspecified dementia without behavioral disturbance."

hearing at which testimony and exhibits were received, an administrative law judge (ALJ) issued an initial order affirming APS's neglect determination. Lytle sought review of the ALJ's order with the DSHS Board of Appeals.

In April 2024, a review judge of the Board considered the administrative record and, on the Board's behalf, affirmed APS's determination. The Board concluded that S was a vulnerable adult, Lytle owed S a duty of care both as her agent under DPOA and due to his voluntarily actions, Lytle engaged in an act or omission between August 4 and August 7, and his "failure provide aid to [S] show[ed] a serious disregard of consequences that constituted a clear and present danger to [S]."

Lytle filed a petition in King County Superior Court to certify this matter for direct appeal to this court, which the superior court granted.

ANALYSIS

I. Appellate Standard of Review of Final Administrative Decision

Lytle's appeal is from a final administrative decision by an administrative reviewing officer. *See* RCW 34.05.464; WAC 388-103-0140(1); WAC 388-103-160(1)(d). On review of such a decision, we apply "'the standards of the [Washington 1988 Administrative Procedure Act (WAPA), chapter 34.05 RCW,] directly to the record before the agency.'" *Heinmiller v. Dep't of Health*, 127 Wn.2d 595, 601, 903 P.2d 433 (1996) (quoting *Tapper v. Emp't Sec. Dep't,* 122 Wn.2d 397, 402, 858 P.2d 494 (1993)). Under WAPA, we may grant relief from where the "agency has erroneously interpreted or applied the law" or the "order is not supported by evidence that is substantial when viewed in light of the whole record

- 6 -

before the court, which includes the agency record for judicial review." RCW 34.05.570(3)(d), (e). A party challenging an agency determination bears the burden of showing invalid agency action and must also show that such action prejudiced them. *Quilang v. Dep't of Soc. & Health Servs.*, 25 Wn. App. 2d 164, 174, 527 P.3d 73 (2022) (citing RCW 34.05.570(1)(a), (d)).

The administrative reviewing officer's decision here arose in response to Lytle's appeal of an ALJ initial decision following an evidentiary hearing. In so deciding, the reviewing officer had the authority to "exercise *all* the decision-making power that the reviewing officer would have had to decide and enter the final order had the reviewing officer presided over the hearing." RCW 34.05.464(4) (emphasis added). Thus, we review "[f]indings of fact from *the agency's final order*," we do so "under the substantial evidence test," and we will uphold such findings "if supported by a sufficient quantity of evidence to persuade a fair-minded person of the order's truth or correctness." *Quilang*, 25 Wn. App. 2d at 173 (emphasis added). Relatedly,

> [w]here the ALJ and the review judge enter contradictory findings, we do not accord the deference to the ALJ that we would accord to the trier of fact in a nonadministrative matter, because the review judge has broad decision-making authority and is intended to bring the agency's expertise to bear.

*Id.* at 173-74.[3]  However, we do "not weigh witness credibility or substitute our judgment for" that of the agency.  *Brown v. Dep't of Soc. & Health Servs.*, 145 Wn. App. 177, 182, 185 P.3d 1210 (2008).[4]

In conducting our substantial evidence review, we consider the evidence in the record "'in the light most favorable to . . . the party who prevailed in the highest forum that exercised fact-finding authority.'"  *Spokane County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 176 Wn. App. 555, 565, 309 P.3d 673 (2013) (internal quotation marks omitted) (quoting *City of Univ. Place v. McGuire*, 144 Wn.2d 640, 652, 30 P.3d 453 (2001)).  Lastly, "[e]vidence may be substantial enough to support a factual finding even if the evidence is conflicting and could lead to other reasonable interpretations."  *Gibson v. Emp. Sec. Dep't*, 185 Wn. App. 42, 53, 340 P.3d 882 (2014).[5]

We review the agency's conclusions of law and its application of law to the facts de novo unless the law falls within the agency's area of expertise.  *Raven v. Dep't of Soc. & Health Servs.*, 177 Wn.2d 804, 817, 306 P.3d 920 (2013); *Karanjah v. Dep't of Soc. & Health Servs.*, 199 Wn. App. 903, 914, 401 P.3d 381 (2017).

---

[3] We note that Lytle presented several assignments of error rooted in the decision of the ALJ in this matter.  However, because our review is from the final administrative decision, which is the Board's decision, not that of the ALJ, we decline to consider those assignments of error.

[4] Nevertheless, "the review judge may commit an error of law if [they] fail[] to give due regard to findings of the ALJ that are informed by the ALJ's ability to observe the witnesses." *Quilang*, 25 Wn. App. 2d at 173-74.  The parties here do not assert that the Board's review officer failed to give such regard to the ALJ.

[5] We note that Lytle, for his part, does not meaningfully contest the Board's findings or whether such findings reasonably support its conclusions of law.  Instead, he relies on evidence in the record that conflicts with the Board's findings.  This is inconsistent with the standard of review and, therefore, inadequate to carry his burden on appeal.

II.      Board's Review Decision on Lytle's Neglect of a Vulnerable Adult

Lytle asserts that the Board erred when it affirmed APS's initial determination that he neglected a vulnerable adult.[6]  We disagree.

A.      The Abuse of Vulnerable Adults Act and Related Regulation

The initial agency determination herein arose from DSHS's enforcement, through APS, of the neglect standard set forth in the abuse of vulnerable adults act (AVAA), chapter 74.34 RCW.  The AVAA "requires DSHS to investigate allegations of abandonment, abuse, exploitation, and neglect of vulnerable adults." *Raven v. Dep't of Soc. & Health Servs.*, 167 Wn. App. 446, 461, 273 P.3d 1017 (2012), *rev'd on other grounds*, 177 Wn.2d 804.

The AVAA defined "[n]eglect," in pertinent part, as "an act or omission by a person or entity with a duty of care that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety."  Former RCW 74.34.020(16)(b) (2019).[7]  The act itself does not define "person or entity with a duty of care," but DSHS later promulgated a regulation that provided, in relevant part, that a "'[p]erson with a duty of care,' in the context of abandonment and neglect, includes:

---

[6] Lytle also designated and assigns error to the superior court order denying his motion to supplement the administrative record.  However, his appellate briefing does not address this order further, and he has, therefore, abandoned that assignment of error.

[7] The current version of the statute defines neglect the same as the version applicable to Lytle at the time of APS's initial determination but is codified at subsection (15), rather than subsection (16).

. . . (b) An agent granted authority under a power of attorney as described under chapter 11.125 RCW." Former WAC 388-103-0001(13) (2021).[8]

### B.    Board's Conclusion that S Was a Vulnerable Adult

On appeal, Lytle does not contest the Board's conclusion that S was a vulnerable adult at the time of APS's neglect allegations against him. We accept Lytle's concession.

The AVAA defined a "[v]ulnerable adult" as including "a person: (a) Sixty years of age or older who has the functional, mental, or physical inability to care for [themselves]." Former RCW 74.34.020(22) (2019).[9]

Here, at the time of the allegations, S was 81 years old and, as determined by the Board, she "had a physical inability to care for herself. She relied on [Lytle] to provide food, transportation, mobility, laundry services, and assistance with telephone calls." The Board therefore concluded that S was a vulnerable adult.

The Board did not err in so concluding.

### C.    Board's Conclusion that Lytle Owed S a Duty of Care under AVAA

Lytle next asserts that the Board erred when it concluded that he owed a duty of care to S in light of her appointment of him as her agent under durable power of attorney. We disagree.

---

[8] The current version of this regulation defines a person with a duty of care the same as the version applicable to Lytle at the time of APS's initial determination but is codified at subsection (14), rather than subsection (13).

[9] The current version of the statute defines "vulnerable adult" the same as the version applicable to Lytle at the time of APS's initial determination but is codified at subsection (21), rather than subsection (22).

1.    Lytle's Acceptance of Appointment as S's Agent under DPOA

Lytle first contends that he did not owe S a duty of care because the record does not reflect that he accepted her appointment to act as her agent under DPOA until *after* the time that he was alleged to have neglected her.  Lytle is incorrect.

Again, per DSHS's regulation under the AVAA, a person with a duty of care in the context of neglect includes "[a]n agent granted authority under a power of attorney as described under chapter 11.125 RCW."  Former WAC 388-103-0001(13)(b).  Chapter 11.125 RCW is the codification of the Uniform Power of Attorney Act, which sets forth that "[e]xcept as otherwise provided in the power of attorney, *a person accepts appointment as an agent under a power of attorney* by exercising authority or performing duties as an agent or *by any other assertion or conduct indicating acceptance.*"  RCW 11.125.130 (emphasis added).

Here, the DPOA document read that it was to be effective immediately upon S's signature, named Lytle as S's agent under DPOA, and was signed by S in December 2018.  Martin's APS report reflected that Lytle acknowledged his status as his mother's agent pursuant to the DPOA to her no later than January 2019.  The events in question occurred nearly one and a half years later, between August 4 and 7, 2021.  Then, on or after August 7, 2021, after S was taken to the hospital, Stewart, and others, indicated that Lytle had told her that he was S's agent under DPOA.  The Board thus concluded that Lytle had accepted S's appointment as her agent.

The Board did not err in so concluding.  Taken in the light most favorable to DSHS, who prevailed in the most recent fact-finding forum, Lytle's conduct of

representing himself before and after the incident in question as S's agent for the purpose of DPOA reasonably constitutes conduct indicating his acceptance of S's appointment. *See Spokane County,* 176 Wn. App. at 565; RCW 11.125.130. Lytle does not present argument or authority suggesting that his representations did not satisfy that provision. Therefore, the record contains substantial evidence supporting the Board's findings of fact and it did not err in applying the law to those facts. Thus, Lytle does not establish an absence of a duty of care to S on this basis.

2. Lytle's Authority To Act as S's Agent under DPOA

Lytle next asserts that he did not owe S a duty of care during the time in question because, even if he had accepted appointment as her agent under her durable power of attorney, neither the catch-all provision of the DPOA document nor the springing provision therein granted him the necessary authority under the circumstances presented in this case. Again, we disagree.

We have recognized that a "power of attorney is a written instrument by which one person as principal appoints another as agent and confers on the agent authority to act in the place and stead of the principal for the purposes set forth in the instrument." *Winters v. Quality Loan Serv. Corp. of Wash., Inc.*, 11 Wn. App. 2d 628, 646, 454 P.3d 896 (2019). "Accordingly, the instrument will be held to grant only those powers which are specified, and the agent may neither go beyond nor deviate from the express provisions." *Bryant v. Bryant*, 125 Wn.2d 113, 118, 882 P.2d 169 (1994). A "springing power of attorney" is defined as "[a] power of attorney that becomes effective only when needed, at some future date or upon

some future occurrence, usu. upon the principal's incapacity." BLACK'S LAW DICTIONARY 1419 (12th ed. 2024).

Here, S's DPOA document stated that its provisions were to be effective immediately. It expressly indicated that it did not require a disability determination because it was effective immediately. It defined her disability or incapacity as including "the inability to manage . . . affairs effectively for reasons such as . . . physical illness or disability." Section 5 of the document also contained a provision indicating, without contingency, that S's agent "shall also have *all powers which may be necessary or desirable to provide for* [*her*] *support*, maintenance, *health, emergencies and urgent necessities*, even if these powers are not specifically set forth in this document." (Emphasis added.) Finally, section 7 of the document set forth a springing power of attorney provision that provided that her agent would not have the authority to "override [her] personal health care decision making so long as [she had] the capacity to make such decisions" and, "[i]n case [she was] incapacitated or disabled, the Agent shall have the power to make health care decisions . . . on [her] behalf, including [the authority to]: . . . make determinations regarding [her] appropriate health care."

The Board found that beginning on August 4, S "was on the ground for 3-4 days when she normally g[ot] up at least every day. This was the longest she had ever been down without being able to get up. Further, by at least August 6, 2021, [S] was barely lucid." The Board then determined that based on the DPOA document, notwithstanding S's stated intention that she did not wish to go to the hospital during this time, Lytle had authority under section 5 of that document to

have "called his brother, the neighbor, or even paramedics just to get [S] off the ground. She did not have to go to the hospital to get that assistance." The Board further determined that S's sudden and unusual inability to get off of the ground for several days along with her declining lucidity constituted a disability triggering the springing DPOA authority under section 7 and granting Lytle authority to override her decision regarding her medical care.

The Board did not err in so determining. Lytle does not meaningfully dispute the Board's findings.[10] Regardless, they are supported by substantial evidence in the record, and the Board interpretation of the DPOA document and its application to the facts in this case are correct. Thus, on this basis as well, Lytle does not establish an absence of a duty of care to S during the incident in question.[11] Accordingly, Lytle does not establish that the Board erred when it determined that he owed a duty of care to S as her agent under DPOA.

---

[10] Lytle concedes that S was no longer lucid or responsive on August 7, and he does not otherwise meaningfully challenge the Board's finding regarding August 6 other than asserting that "the record is clear it is on [August 7] that Mr. Lytle saw [S] was not cogent." Without more, this is insufficient to carry his burden pursuant to the substantial evidence standard.

[11] We can also determine that Lytle owed S a duty of care during the time in question on another basis reached by the Board and independent of his duty owed as S's agent under DPOA. Here, the Board found that Lytle was providing food, laundry, transportation, mobility, and communication services for S on an ongoing basis. Given this, the Board determined that Lytle owed S a duty of care pursuant to former WAC 388-103-0001(13)(c)(ii) because Lytle was also "a [p]erson providing the basic necessities of life to a vulnerable adult where: . . . [t]he person voluntarily agrees to provide, or has been providing, the basic necessities of life to the vulnerable adult on a continuing basis." The Board did not err in so finding and determining.

Lytle nevertheless asserts that this was not a valid basis on which the Board could rely for its decision because it was not one considered by the ALJ. Although he is correct that the ALJ in this matter did not expressly consider this basis, we may nonetheless rely on the findings and conclusions of the Board's reviewing officer who had the authority and expertise to "exercise all the decision-making power that the reviewing officer would have had to decide and enter the final order had the reviewing officer presided over the hearing," including entering findings of fact and conclusions of law. RCW 34.05.464(4). Therefore, we also conclude that the Board did not err when it determined that Lytle owed S a duty of care in light of his voluntary provision of the basic necessities of life to S on a continuing basis during the time in question.

D. Lytle's Neglect of S under the AVAA

Lytle next asserts that even if he had such a duty of care, the Board erred when it determined that he neglected S during the time in question. We disagree.

As relevant here, under the AVAA,

[DSHS] needed to establish three elements by a preponderance of the evidence to prove that [a person or entity] neglected a vulnerable adult. These elements were "(1) [a person or entity] committed an act or omission; (2) the act or omission demonstrated a serious disregard of consequences; and (3) the disregard was of such a magnitude to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety."

*Woldemicael v. Dep't of Soc. & Health Servs.*, 19 Wn. App. 2d 178, 183-84, 494 P.3d 1100 (2021); *see also* RCW 74.34.020(15) (defining "neglect"). We consider each of these elements in turn.

Here, with regard to Lytle's act of omission, the Board found as follows:

[T]he preponderance of the evidence shows that [Lytle] failed to provide proper care while [S] was unable to get off the floor for four days. [Lytle] still brought [S] food and drinks, but she was unable to use the restroom, and no extra care was taken to help with her bathroom needs while she was on the floor for four days.
. . .
[Lytle] did not act timely in providing assistance to his mother while she was on the floor for multiple days.

The Board did not err in so finding and concluding. Apart from bringing S food and drinks and attempting to assist her with getting up off of the floor, Lytle did not take additional remedial action toward S from when she fell down on August 4 until he reached out to a neighbor and his brother and later dialed 911 on August 7. Therefore, the Board did not err when it determined that Lytle engaged in an act of omission toward S during the time in question.

The Board next found that Lytle was unable to assist S in getting up off of the floor over a period of several days and, over that same period of time, provided her with food and drink while she was on the floor. From this, the Board concluded that Lytle had demonstrated a serious disregard of the consequences of such a circumstance. This was so, the Board determined, because Lytle had "provided [S] with food and drinks while she was on the floor for multiple days *but did not assist in helping her use the restroom or to clean up*. The excuse he did not know she soiled herself is not credible because most people cannot go 3-4 days without using the restroom when they are still eating and drinking." (Emphasis added.)

This conclusion by the Board was also proper. The record reflects that Lytle was aware that he was providing an individual with food and water while she was unable to remove herself from the floor over a period of several days. It is reasonable to infer that such an individual would consequently need either access to a restroom or, in the event of their inability to gain access to a sanitary space, require cleaning. It is undisputed that Lytle did not provide as much to S herein. Therefore, the Board did not err when it concluded that Lytle's omission constituted a serious disregard of consequences.

Finally, the Board concluded that Lytle's disregard was of such a magnitude so as to constitute a clear and present danger to S's health, welfare, or safety. Plainly, Lytle's failure to act under these circumstances was of the required magnitude; the clear and present danger to the health, welfare, and safety of the

81-year-old woman in this case arising from his omissions in this matter does not necessitate further explanation. The Board did not err.[12]

Affirmed.

WE CONCUR:

_____        _____
Feldman, J.                        Díaz, J.

---

[12] Lytle requests an award of attorney fees pursuant to RAP 18.1 and RCW 4.84.350, which provide this court the discretion to grant such a request when made by a prevailing party. Because Lytle does not prevail, we deny his request for fees.